## MICHIGAN IRON & LAND CO. v. NESTER.[1]

1. LOGS AND LOGGING—STUMPAGE CONTRACT—CONSTRUCTION.
    A contract to sell all the merchantable timber on certain lands cut prior to a date named conveys only so much of the timber as shall be cut within the time specified.

2. SAME—TAXES—ENFORCEMENT.
    Where a contract for the sale of the timber on certain lands provides that the purchaser shall pay the taxes levied upon the lands, and reserves title to the timber until the purchase price is paid in full, the purchaser's agreement to pay the taxes is not a mere personal covenant, enforceable only at law, but is a condition constituting a part of the purchase price for which the vendor has a lien enforceable in equity.

3. EQUITY—JURISDICTION—LIENS—ENFORCEMENT.
    Where the chancery court acquires jurisdiction by an original bill to enforce a lien on standing timber for taxes paid by the vendor, it is not ousted by the fact that before the case is brought on for hearing all the timber to which the lien might attach has been removed by defendants.

[1] Rehearing denied July 15, 1907.

4. LOGS AND LOGGING — STUMPAGE CONTRACT — CONSTRUCTION —
   TAXES—PAYMENT—INTEREST.

   Where the purchaser of standing timber agreed to pay the taxes
   on the land until the timber should be cut, but it was agreed
   that the vendor might pay them, and if it did, the purchaser
   was to repay the amount, with interest from the date of pay-
   ment, the bringing of suits by third persons contesting the
   title of the vendor and enjoining the cutting of timber did
   not operate to waive the right of the vendor to interest, dur-
   ing their pendency, on the amounts paid as taxes.

5. EQUITY—SUPPLEMENTAL BILL—PROPRIETY — ENFORCEMENT OF
   LIEN—SUBSEQUENT CLAIMS.

   On a bill by the vendor against the purchaser of standing
   timber to enforce a lien for taxes and interest paid by the
   vendor which the purchaser is required by the contract to
   pay, the vendor is entitled to file a supplemental bill, in-
   cluding taxes paid subsequent to the filing of the original bill,
   notwithstanding the timber has all been removed by the
   purchaser; it being proper to retain jurisdiction once obtained
   and dispose of the entire controversy.

6. LOGS AND LOGGING—STUMPAGE CONTRACT—PAYMENT OF TAXES
   —LIABILITY—RELEASE.

   Where a contract for the sale of standing timber required the
   purchaser to pay the taxes on all the land until all the timber
   was removed, but provided that he might relieve himself of
   that liability as to each governmental subdivision by notify-
   ing the vendor in writing that such subdivision had been cut
   over, relief from liability could only be obtained by serving
   the required notices, and actual knowledge of the vendor as
   to the progress of the cutting, and its acts in appearing before
   the taxing authorities and securing reductions of its assess-
   ments on the ground of removal of the timber are im-
   material.

7. EXECUTORS AND ADMINISTRATORS— LIABILITY — PERFORMANCE
   OF CONTRACTS.

   Where, after the death of the purchaser of standing timber, his
   administrator and heirs continue to cut the timber at large
   profit, they are estopped to deny their liability for the taxes on
   the land during the life of the contract, as provided therein,
   and a decree for such payments is not erroneous because hold-
   ing the heirs personally liable or because establishing a claim
   against the estate.

Cross-appeals from Houghton; Streeter, J.    Submitted

January 9, 1907. (Docket No. 9.) Decided March 26, 1907.

Bill by the Michigan Iron & Land Company, Limited, against George Nester, administrator of the estate of Thomas Nester, deceased, and others, for an accounting. From the decree rendered, all parties appeal. Modified and affirmed.

The controversy in this case arises over a contract made December 30, 1882, between the Michigan Land & Iron Company, Limited, a copartnership association, the assignor of the complainant, party of the first part, and Thomas Nester, party of the second part. The material parts of the contract are as follows:

"The said party of the first part, for and in consideration of the sum of two hundred and sixty-nine thousand five hundred and sixty-one dollars, and an item of interest, all to be paid as hereinafter provided, and of the faithful performance of the covenants, agreements and conditions, hereinafter expressed, on the part of the party of the second part to be performed (the performance of each and every of said covenants, agreements and conditions, including the payment of said moneys, being hereby expressly declared condition precedent, and of the essence of this contract), hereby agrees to sell to the party of the second part all the pine timber now fit for merchantable uses growing, standing or being upon the following described lands, situate in the counties of Baraga and Houghton, in the State of Michigan [description of the land is unnecessary]. * * *"

All the timber was to be removed by December 30, 1902. Specific provisions were made for cutting and removing the timber. And the contract proceeds:

"But the said party of the second part shall have the right, during the continuation of this agreement, to cross any of said tracts or parcels of lands and to use the streams thereon for the purpose of removing the said pine timber from other tracts or parcels of said lands; provided, he shall so cross and use the same in such manner as shall interfere as little as practicable with the use of said lands

and streams by the party of the first part and any and all persons claiming under them.

" It is further understood and agreed that when said party of the second part shall enter upon any tract or parcel of said lands of the smallest government description for the purpose of cutting the said timber therefrom, as hereinbefore provided, he shall cut said. tract or parcel clean of merchantable pine as soon as practicable due regard being had to the contemporaneous cutting upon other lands; and forthwith, as soon as the same be cut clean as aforesaid, shall notify the party of the first part in writing, specifying by forty-acre tracts the land so cut clean; whereupon all right of the party of the second part to pine timber on, or to cut and remove the same from, such tract or parcel shall cease and be terminated.

" One-half of all expenses properly incurred by the party of the first part in examining the said lands for the purpose of ascertaining whether the cutting by the party of the second part has been done under and pursuant to the conditions of this agreement, shall be paid by the party of the second part, and if it appears that there has been unauthorized cutting, all of such expenses shall be paid by him.  *  *  *

" It is further understood and agreed that the title to the pine timber aforesaid shall be and remain in the party of the first part until payment therefor be made in accordance with the terms and provisions of this contract.  On making each of said payments and performing the other conditions of this agreement then required to be performed, the party of the second part shall have the right and be entitled to select, cut and remove, in the manner aforesaid, and within the period of time hereinbefore mentioned, a portion of the pine timber on said lands corresponding in ratio to the payments so made.  And in case said payments, or any of them, be not made by maturity, the time of payment being of the essence of this agreement, or in case the party of the second part shall fail to comply with any or all other of the terms and provisions hereof, the said right to acquire timber, and all other rights and privileges on the part of the party of the second part hereunder existing or arising, excepting as to any timber heretofore paid for, shall thereupon forthwith cease and be terminated; and the party of the first part shall have, hold and enjoy said timber and all right, title and interest therein free and clear

of any right or claim whatsoever of the said party of the second part thereto; and all payments theretofore made by the party of the second part thereon of every kind shall be forfeited and belong to the party of the first part, without obligation to refund the same or any part thereof.
\*   \*   \*

"And the party of the second part further agrees that he will pay all taxes, general and special, of every kind whatsoever which shall be assessed upon or against the lands above described from and after the date hereof until the pine timber shall be removed as aforesaid, or the right to remove the same shall be forfeited and lost as herein provided. And as fast as the lands shall be cut over, and a report in writing of such fact be made by the party of the second part to the party of the first part, specifically describing by forty-acre tracts the lands so cut over, the requirement to pay taxes on the lands so described shall thereupon cease. The party of the first part may pay any and all taxes assessed on said lands, or any part thereof, to be paid by said party of the second part as aforesaid, and all sums so paid by him, with interest, shall forthwith thereafter become payable and be paid by the said party of the second part to said party of the first part.

"And the party of the first part doth covenant and agree to and with the said party of the second part to warrant and defend the said pine timber hereby sold unto the said party of the second part, his executors, administrators and assigns, against all and every person and persons whomsoever. And it is further expressly agreed that in the event of a breach of said covenant the damage to be recovered shall in no case exceed the consideration price for said timber herein mentioned, with interest thereon; and in case of a breach of said covenant as to any part of said timber, such damage shall not exceed a corresponding portion of said consideration price with interest.

"And it is further understood and agreed that in entering upon, cutting and removing the pine timber from said lands, the party of the second part shall so conduct his business thereon as to interfere as little as practicable with the use of said lands for other purposes.

"This agreement shall apply to and bind the heirs, executors, administrators, successors, legal representatives and assigns of the respective parties hereto."

The contract, though dated December 30, 1882, was not in fact executed until the 6th of June, 1883. Under a parol agreement Mr. Nester was permitted to enter upon the lands during the winter of 1882 and 1883, and it was agreed that, should the contract fail of execution, he should pay for what timber he had meanwhile cut and removed. Mr. Nester, until his death in May, 1890, cut timber generally from the lands. A similar course was pursued by the defendants after his death until the entire amount was cut and removed during the year 1902, within the time prescribed by the contract. On December 31, 1896, the defendants gave notice under the contract that they had cut and removed the timber from certain of the lands, and that they released and quitclaimed all right or interest therein. This notice was by 40-acre descriptions, 160 in number. On November 28, 1900, the defendants gave complainant a similar notice covering all of the remaining lands except one section, but not in 40-acre tracts. Mr. Thomas Nester gave a verbal notice of the release of one section of land. That notice was accepted and the release minuted on the proper book of the Michigan Land & Iron Company. No notice was ever given of the release of the section, not included in its notice of November 28, 1900, and the right to cut timber thereon expired by limitation December 30, 1902. The lands owned by the Michigan Land & Iron Company purchased from the railroad company were the odd sections. Mr. Nester owned the even sections, and was lumbering from them at the same time. It appears from the letter written by Mr. Thomas Nester, of date December 13, 1883, that he expected the Michigan Land & Iron Company to look after the taxes, "and take all responsibility for the correctness and completeness of lists and receipts." That company did this, paying the taxes and rendering statements therefor to Mr. Nester, which Mr. Nester paid every year to and including the taxes of 1888. Neither he nor the defendants who succeeded by heirship to his rights have paid any of the taxes since, except on

three sections for 1898. The defendants having neglected and refused to pay, the Michigan Land & Iron Company filed its bill in equity on November 19, 1895, setting up the contract, the nonpayment of the taxes and the refusal to pay, the payment thereof by complainant, and prayed for an accounting as to the amount, for a decree therefor, and that, in default of payment, the defendants be enjoined from removing the timber, and be barred from all claim therein.

The defendants Margaret Nester and Patrick Nester answered, disclaiming all interest in the suit. The other defendants answered, admitting the contract and their obligation under it to pay the taxes, but set up as an excuse a certain suit hereinafter referred to, instituted by the United States against the defendants, denying title of the defendants and of the Michigan Land & Iron Company in and to certain of the lands covered by the contract, and alleging, upon information and belief, that complainant had notice and knowledge that a large part of the lands had been cut over; that said knowledge amounted to a compliance with the provision of the contract for a notice that the land had been cut over; that complainant had waived that provision in the contract for the punctual payment of taxes, and that said claim for repayment of taxes was "a mere personal claim against the defendants or some of them to be collected by ordinary legal proceedings, and are not a lien upon the said lands." Replication was duly filed to this answer. The defendants filed a bond in the sum of $15,000 to pay any sum that the court might decree against them, and the preliminary injunction which had been issued was dissolved. No further proceedings were taken in that case until after the determination of the suit in the United States court. After that suit was determined and on April 18, 1904, complainant filed a petition alleging its succession to the property and rights of the Michigan Land & Iron Company, and praying for leave to file a supplemental bill, that order was entered, and a supplemental bill filed, setting forth

the payment of the taxes after the filing of the original bill until the termination of the contract and the amounts thereof, and praying for a decree for the amounts so paid by it, as well as those paid prior to the filing of the original bill.

The complainant obtained its title to these lands from the Marquette, Houghton & Ontonagon Railroad Company. They were a part of a grant of lands by the United States to the State for the construction of railroads. The railroad company, claiming that it had performed the conditions of the grant, obtained from the State certifications or patents for the land so claimed to be earned. Meanwhile a few homesteaders entered upon some of these lands, claiming that the railroad company had no title. Five of these homesteaders also instituted suits in chancery against the Michigan Land & Iron Company, claiming that the title of the Michigan Land & Iron Company was void. Of the lands covered by the contract, 5,620 acres were involved in the suit brought by the United States, leaving 12,120 acres about which no contest arose. That suit was finally determined in favor of the Michigan Land & Iron Company, and the defendants, and a decree entered in the United States court October 24, 1902, dismissing the bill of complaint, and decreeing the title to be in the Michigan Land & Iron Company, its successors and assigns. Neither Mr. Nester nor the defendants paid taxes upon any of the lands except as above stated. The proceedings in the contest over that title, both before the department of the interior at Washington and in the United States court, and the decree sustaining the complainant's title, were set forth in this supplemental bill. Answer was duly filed and proofs taken. The answer is based chiefly upon the same defenses as those set up in the answer to the original bill. The court entered a decree for the amount of the taxes by complainant and its assignor up to the time of filing the original bill, with interest thereon from the 24th of October, 1902, the date on which the complainant's title was affirmed by the decree of the

United States court. The court denied the prayer of the supplemental bill, and dismissed it, holding that, as the supplemental bill was filed after the timber had been removed, the claims had become mere personal demands, that there was no property to which to attach a lien, and that the remedy was at law.

Both parties appeal.

*Ball & Ball*, for complainant.

*Tarsney & Fitzpatrick*, for defendants.

GRANT, J. (*after stating the facts*). Complainant insists that the court erred:

(1) In refusing to allow interest from the time the taxes were paid, rather than from the time of the final decree entered in the suit in the United States court.

(2) In dismissing the supplemental bill and refusing to enter a decree for the amount of taxes paid subsequent to the filing of the original bill.

(3) In allowing interest at 5 per cent., rather than the rate in force when the taxes were paid by complainant.

The defendants contend:

(1) That the court of equity had no jurisdiction, and that complainants' remedy was at law.

(2) That defendants' liability to pay taxes on the lands not involved in the suits brought in the United States court ended when the timber had been cut and removed therefrom, although the notice required by the contract was not given.

(3) That the liability for taxes involved in those suits ended with the taxes for 1892.

(4) If, however, the defendants were still liable to pay those taxes, the time of repayment was modified, and the same were not repayable until the final determination of the United States cases, October 24, 1902, and that interest did not begin to run until a reasonable time after demand.

(5) That a personal decree cannot be entered against the heirs of Thomas Nester.

1. Did the court of chancery have jurisdiction ? The

contract between these parties is unambiguous. It contains no provision of doubtful meaning. The Michigan Land & Iron Company agreed to sell all the merchantable timber on the lands which the vendee should cut prior to December 30, 1902. The construction to be placed upon this part of the contract is determined in *French* v. *Lumber Co.*, 135 Mich. 424. It conveyed only so much of the timber as should be cut within the time specified. See, also, *Golden* v. *Glock*, 57 Wis. 118; *Hicks* v. *Smith*, 77 Wis. 146. But the title to the timber was expressly reserved in the vendor until it was cut and removed in compliance with the terms of the contract.

The money consideration was divided into two parts, namely, the cash payments to be made at various times for the timber and the cash payments for taxes as they were assessed upon the land. It is fair to presume that the price for the timber was fixed with reference to the payment of taxes, just as the rate of interest in a mortgage is made with reference to the payment of taxes by the mortgagor. The times at which these taxes were to become due were fixed by the law. The only thing uncertain was the amount; and that became certain every year. The defendants' theory is that the provision for the payment of taxes by the vendee was a covenant, and not a condition. The payment of taxes was just as much a part of the money consideration as was the payment of the price agreed upon. It was therefore a part of the purchase price. But, as was said in *Monroe* v. *Bowen*, 26 Mich. 523, the name to be attached to it is of little importance. Under the defendants' theory the vendee might neglect to pay the taxes or to perform any of the other agreements by him to be performed, and coolly say to the vendor:

"These are simply covenants on my part. Sue me at law. I have paid you the moneys particularly specified in the contract as the purchase price, and now propose to remove this timber without complying with any of the other agreements on my part, and leave you to your suits at law."

This position is not sustained by the authorities or founded in reason. *De Forest* v. *Holum,* 38 Wis. 516; *Brown* v. *Brown,* 124 Mo. 79; *Koch* v. *Roth,* 150 Ill. 212; *Grove* v. *Miles,* 58 Ill. 338. It is conceded that, if the taxes are to be considered a part of the purchase price, the vendor has a lien therefor upon the timber. It is unnecessary to discuss cases of strict foreclosure or to enforce forfeitures. The bill is not framed for the sole purpose of declaring a forfeiture, or to enforce a strict foreclosure. It specifically prays that the defendants may "be decreed to pay to your orator the amount of all taxes paid by your orator as aforesaid, together with the interest thereon by a day certain." The bill did not seek to deprive the defendants of any rights. It sought only to compel them to perform their contract after the court had decreed that they should, and had fixed a reasonable time for performance. It properly asked that they be restrained from removing the timber until they had made payment as the court should decree. The law in such case does not require the vendor to look to the pecuniary responsibility of his vendee. A court of equity is a proper forum in which the vendor's right can be enforced and the performance of the contract secured.

Whether the defendants acquiesced in the jurisdiction of the court by answering and giving a bond by which the injunction was removed, and they allowed to proceed with their work, we need not determine. It is sufficient to hold that the court acquired jurisdiction by the original bill, and is not ousted of that jurisdiction by the fact that before the case was brought to a hearing all the property to which a lien might attach was removed by the defendants. 16 Cyc. p. 106; 11 Am. & Eng. Enc. Law (2d Ed.), p. 201; *Lane* v. *Traction Co.,* 135 Mich. 70; *Beal* v. *Chase,* 31 Mich. 490, 534; *Hall* v. *Nester,* 122 Mich. 141; *McLean* v. *McLean,* 109 Mich. 258.

2. The terms of the contract upon payment of taxes and interest are explicit. The vendee agreed to pay them.

147 Mich.—39.

The vendor might pay them, and, if it did, the vendee agreed to repay the amount, with interest from the date of payment by the vendor. There is nothing upon the record from which an agreement that interest should be waived during the pendency of the suits in the United States courts can be inferred. On the contrary, it appears from the correspondence that the Michigan Land & Iron Company and its successor notified the defendants from year to year of the payment of the taxes, and the demand for repayment. In all the letters that passed between the parties there is no claim of or reference to a waiver of the interest. The learned circuit judge was in error in finding that there was any such agreement. The suits brought in the United States court did not operate to waive any of the rights of the complainant in the contract. It was not responsible for those suits. The complainant and the defendants in them appeared by their own solicitors and counsel. The solicitors for complainant deemed it advisable to proceed before the department of the interior at Washington. The solicitors for the defendants believed that their title was perfect, and at times strenuously insisted upon pushing the suit. The defendants might have done so regardless of the wishes or advice of the complainant's solicitors. Why the proceedings in the interior department were pending so long without a decision does not appear. Mr. Thomas Nester was undoubtedly familiar with the title to the land. He assumed any risk of delay that might be caused by an attack upon the title. There is no evidence that the defendants suffered any serious damage by the delay. On the contrary, the standing timber was rapidly increasing in value. In fact, it had doubled in value. The complainant was liable to the defendants upon its covenant of warranty, and it was expressly agreed in that covenant that upon—

" A breach of said covenant the damage to be recovered shall in no case exceed the consideration price for said timber herein mentioned, with interest thereon; and, in case of a breach of said covenant as to any part of said

timber, such damage shall not exceed a corresponding portion of said consideration price, with interest."

In view of the rapidly increasing value of the timber, the importance to the defendants of sustaining the title is apparent.  It is a fair conclusion from the conduct of the parties, and as well from the evidence, that the defendants yielded to the opinion of the solicitors for the complainant in the course pursued by them.  Whether that was the wiser and speedier remedy is not material for us to consider.  Aside from this, there is no evidence in the record from which a court can fix the damages if any there were.  Mr. Nester had other and adjoining lands he could lumber, and on January 8, 1890, his attorney wrote the manager of the Michigan Land & Iron Company:

"If enjoined, he [Nester] has other lands in that vicinity upon which he is cutting, and upon which he could put all his force without causing him any great damage, I think."

This question is, however, decided in *Monroe* v. *Bowen*, supra.  In that case the grantor of the land reserved the timber if he should remove the same before a specified time.  The land was attached by a third person and the owner of the timber enjoined from cutting it within the time specified.  This court held that all contingencies and risks of embarrassment of this kind must be estimated by the parties in making their contracts.  It is in evidence that the defendants could have obtained a dissolution of the injunction in the United States court by giving a bond.  They insisted that the Michigan Land & Iron Company should furnish the surety.  They claimed that at one time an agreement was made that they should furnish one surety and the Michigan Land & Iron Company the other.  This was denied by the company, and no bond given.  There was a tacit, if not an express, understanding that the matter of taxes should be adjusted on the termination of the suit in the United States court, and that meanwhile the Michigan Land & Iron Company should pay them.  If complainant's title to any of the

lands was void, it was liable in damages, and, if the
defendants had meanwhile paid the taxes, they could,
under the limitation in the covenant of warranty, have
recovered them from the complainant only as a part of the
purchase price.  There is no equity in relieving the de-
fendants from the payment of taxes or interest thereon.
They have had the use of the money which they agreed
to pay.  The complainant has lost the use of its money
which it was under no obligation to pay.  Furthermore,
the defendants were requested to pay the taxes on the
lands the title to which was not in dispute.  This they
did not do.  The payment of these taxes was permitted
to rest in abeyance until the determination of the suit in
the United States court.  There is no reason in even a
supposition that the vendor intended to waive the ultimate
payment of these taxes, or the interest thereon, or that
the defendants understood that payment of either was
waived.

3.  The court was in error in dismissing the supplemental
bill.  By the original bill the court obtained jurisdiction
of the parties and of the subject-matter of the litigation.
Taxes assessed subsequent to the filing of the original bill
were governed by the same contract and by the determi-
nation of the court in that case.  In foreclosing a mort-
gage for nonpayment of one installment, if before the
determination of the suit another installment falls due,
the subsequent installment may be included in the final
decree upon a supplemental bill.  In that case it would
make no difference that meanwhile the property had been
totally destroyed.  Having once obtained jurisdiction, the
court will retain it to dispose of the entire controversy
between the parties, and to ascertain and decree the
amount due.  The same principle applies here.  The de-
fendants are not prejudiced by the court's retention of
jurisdiction to settle the entire controversy.  There are
no material questions of fact in dispute to be submitted to
a jury, and, if there were, it would make no difference.
The sole advantage which these defendants could now

obtain if the supplemental bill were dismissed would be
an opportunity to plead the statute of limitations in a suit
at law.  Under the circumstances this would be most in-
equitable.

4.  The first clause of the provision in regard to the pay-
ment of taxes would have required the vendee to pay the
taxes upon all the lands until all the timber was removed.
The next clause, however, provided that the vendee
might relieve himself from the payment of taxes by re-
porting in writing the fact that the lands specified in the
notice had been cut over.  By a previous provision of the
contract it was arranged that the Michigan Land & Iron
Company might enter upon and examine these lands for
the purpose of ascertaining whether the cutting had been
done pursuant to its terms.  It was not contemplated that
knowledge thus obtained or obtained in any other manner
should be the equivalent of the notice or release provided.
The vendee and his heirs thoroughly understood the con-
tract, and gave notices as required.  Knowledge of the
extent of the cutting thus obtained by the vendor did not
release the vendee or the defendants from the obliga-
tion to give the notice.  The vendor's agent, from time
to time, appeared before the taxing authorities, and re-
ported, for the purpose of having the taxes reduced, the
extent of the cutting.  This was a favor to the vendee,
and is no legal excuse for failure to give the notice;
neither does it constitute a waiver of the notice.

Furthermore, it is in evidence that the vendor's agents
talked with the respondents about releasing the land, that
they replied that they would look it up and see what they
could do, and that defendants made no replies, but that the
only releases were those specified in the above statement
of facts.  The reason for such a notice is apparent.  The
vendor might desire to sell the remaining timber, or to
sell the land to other parties.  Any proposed purchaser
would run the risk of buying a lawsuit with the defend-
ants.  They might insist that they had not completed their
cuttings, and that their right to cut had not terminated

until they had given the notice required. The defendants were under obligation to pay the taxes until they had absolved themselves from that obligation by giving the agreed notice.

5. It is further urged that the decree is erroneous because (1) it holds the heirs of Thomas Nester personally liable for his debts; (2) it establishes a claim against the estate of Thomas Nester. Thomas Nester paid all the taxes assessed upon the lands during his lifetime, except that of the year previous to his death. The bill alleges that the defendants were the heirs of Thomas Nester; that defendant George Nester was also the administrator of his father's estate; that the defendants were proceeding to cut the timber under the contract, ignoring their duty to pay the taxes. The answers to both the original and supplemental bills admit that the defendants were cutting the timber under the contract, and claimed the right to do so. By the bill the defendants are placed in the position of assignees of the contract. The answers admit it. No claim in their answers or during the progress of the suit, or upon the hearing, was made that the defendants were not proper parties. The defendants by their pleadings have admitted that their rights are virtually the same as those of an assignee of the contract. They assumed the right to act under it. They have acted under it, and received the profits, which were very great. Neither law nor equity will permit them to receive the benefits without bearing the burdens imposed by the contract. By their pleadings and conduct they have made the obligations of the contract their own, and are personally liable for the performance of its conditions. Whether the administrator was acting under the order and direction of the probate court in performing this contract does not appear. If the administrator alone were performing it, whether by the direction of the probate court or without, he could not, neither could the estate, obtain the benefits of the contract without assuming its obligations. If, as we have held, a court of equity had jurisdiction to com-

pel the performance of the contract, it would follow that the court could make a decree binding upon the estate. If the administrator and heirs have seen fit to perform this contract, both are estopped to now set up that the decree is not binding upon both. It is immaterial to these defendants whether the decree is certified to the probate court and paid by the administrator for the benefit of all, or whether it is paid by the defendants individually, or whether the administrator, who is a party defendant, pays it and charges it against the estate. Whatever method of payment is adopted, the defendant heirs of Thomas Nester pay it.

The decree will be modified in accordance with this opinion, with costs to the complainant.

MCALVAY, C. J., and BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.