Argued October 7, affirmed December 9, 1959, petition for
rehearing denied January 5, 1960

## PAULLUS *v.* YARBROUGH ET UX

347 P. 2d 620

*William E. Taylor,* Gold Beach, argued the cause for appellants. On the brief were Taylor & Miller.

*A. J. Newhouse,* Coos Bay, argued the cause for respondent. On the brief were McKeown, Newhouse & Johansen.

Before McAllister, Chief Justice, and Perry, O'Connell and Redding, Justices.

O'CONNELL, J.

This is a suit in equity brought by the buyer named in a timber contract to enjoin the sellers from preventing the buyer from continuing logging operations in accordance with the terms of the contract. The plaintiff also seeks to recover $9,120 damages alleged to have resulted from defendants' interference with plaintiff's logging operations.

The trial court entered a decree enjoining the defendants from preventing the plaintiff from going upon the defendants' land for the purpose of cutting and removing the poles and logs thereon in accordance with the terms of the contract. The prayer for damages was denied. The defendants appeal from the decree granting the injunction, contending that the trial court erred in the following respects; (1) in not holding that the agreement in this suit created a license revocable by defendants, (2) in decreeing in effect specific performance of an agreement respecting personal property, (3) in granting an injunction to enforce an agreement which lacks mutuality and which is too indefinite and uncertain to make practical

its enforcement, (4) in failing to find that plaintiff breached the agreement, thus entitling defendants to rescind it in accordance with its terms.

The contract, entitled "Timber and Pole Contract" read as follows:

"THIS AGREEMENT made and entered into this 11th day of February 1955, by and between FRED S. YARBROUGH and HILDA I. YARBROUGH, husband and wife, of Norway, Coos County, Oregon, hereinafter known and designated as the Sellers, and CLAUDE F. PAULLUS, of Myrtle Point, Coos County, Oregon, hereinafter known and designated as the Buyer.

"WITNESSETH that for and in consideration of the covenants and agreements herein contained to be kept and performed by the parties hereto, and the payments to be made by the Buyer to the Sellers as are hereinafter set forth; the Sellers do hereby agree to sell to the Buyer, and the Buyer does hereby agree to purchase from the Sellers all of the pole timber and all of the standing merchantable red fir and white fir timber upon the following described real property, to-wit:

"The West Half of the Southwest Quarter, the Northeast Quarter of the Southwest Quarter and the Southeast Quarter of the Northwest Quarter, Section 27; the South Half of Section 28; the Northwest Quarter and the North Half of the Northeast Quarter, Section 33; and the Northwest Quarter of Section 34; all in Township 28 South, Range 12 West of the Willamette Meridian, Coos County, Oregon.

"It is understood and agreed that the Buyer shall commence logging of said poles and timber as soon as weather conditions permit and thereafter to continue said logging continuously and diligently, bad weather conditions excepted, until such time as all the timber herein agreed to be purchased has been removed from the above described premises. All of the said timber and poles

shall be so removed from said lands within three years from this date, and any timber remaining on said premises thereafter shall revert to and remain the property of the Sellers and the Buyer shall claim no further interest therein whatsoever.

"It is understood and agreed that the logging operation is to be a selective logging operation in that the Sellers shall designate to the Buyer which poles and logs shall be removed and the order of their removal. Buyer agrees to do all logging in a good and workmanlike manner refraining from all unnecessary damage to the land of Sellers and to other growing timber.

"As payment for said timber the Buyer agrees to pay to the Sellers the sum of four cents (4¢) per lineal foot for all poles removed from said premises, the sum of ($10.00) Ten and no/100 Dollars per thousand feet for all red fir logs removed, and the sum of ($8.00) Eight and no/100 Dollars per thousand feet for all white fir logs removed from said premises, such payment to be made to the Sellers directly by the purchasers of said poles or timber. This agreement shall be considered authority for such purchasers to withhold such sums from the Buyer and to reimburse the Sellers directly. Buyer agrees to keep Sellers currently advised as to the names of the purchasers of said logs and poles and to provide Sellers, upon demand, with duplicate scale sheets or invoices covering all logs or poles removed from said premises, and Sellers shall have the right at all times to examine the books and records of the Buyer in order to satisfy themselves regarding the amount of timber and poles removed from said premises.

"The Buyer agrees to repair any and all damage which his operations may cause to the rock road on said premises. Buyer agrees to comply with all laws and regulations of the state and federal governments or any agency thereof relating to the cutting, logging, and removing of such timber or poles for the prevention of fire, to pay all taxes of any kind or nature which may be levied

or assessed against said timber after this date, including any taxes or assessments which may be levied by reason of severance of the timber including reforestation taxes, and taxes assessed under the Oregon Forest Experimental Research Tax Act.

"Buyer agrees to assume all responsibility for any and all men employed by him on said premises, and to cover said men by Workmen's Compensation, and shall promptly pay all sums becoming payable under any government agency by reason of any work done for the logging of said poles or timber, and shall not permit any lien or lienable claims of any kind or nature to accrue upon or attach against any timber or poles herein agreed to be sold, and in the event such a lien or claim of a lien being filed or made upon the same the Buyer agrees forthwith to discharge said property therefrom.

"In the event the Buyer shall fail to comply with each and every term and condition herein mentioned to be kept and performed by him, and in the event such default shall not be remedied within 20 days after written notice thereof from Sellers to the Buyer, then and in that event the Sellers shall have the right to declare this contract null and void and of no further force or effect and no sums which have been paid hereunder shall be refunded to the Buyer.

"In the event any suit, action or proceedings shall be instituted hereunder or commenced for the purpose of enforcing, terminating, reforming, or cancelling this agreement or any part thereof, or any of the rights, duties, or liabilities arising hereunder it is agreed that the prevailing party shall, in addition to the costs and disbursements provided by Statute, recover such sum as the Court may adjudge reasonable as attorney's fees.

"This contract shall apply to and bind the parties hereto, their heirs, executors, administrators and assigns jointly and severally.

"IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals the day and year first herein written."

The defendants contend that the foregoing agreement created no more than a revocable license in the buyer to remove merchantable timber from the described land.

The instrument clearly states that the sellers agree to sell and the buyer agrees to purchase all of the standing merchantable timber. Standing alone this would leave no doubt that a breach of contract would result if the seller refused to permit its removal or if the buyer failed to pay for all such timber, whether or not it was removed. However, two other clauses in the instrument cast doubt upon such an interpretation. The first of these is the provision relating to payment. The buyer is obligated to pay a unit price "for all poles removed" and a similar provision is made with respect to the saw logs. This could be interpreted to mean (1) that the buyer was not obligated to pay for any poles or logs unless he removed them, or (2) that he was obligated to pay for all of the timber, whether it was removed or not but that if he did remove any of it payment would be made as it was removed. Accepting the first of these alternatives, the buyer's interest would be described as follows. First, in terms of a *property* interest, he would acquire a license to enter the sellers' land. The privilege to do so would last only so long as the sellers did not revoke it. Secondly, in terms of *contract* law, since by hypothesis the seller has the power and privilege to prohibit the further cutting of the timber, absent an estoppel, the buyer has no contract remedies in the event the power is exercised.

In the instant case the briefs and arguments of both plaintiff and defendants are built around the assumption that the agreement created a revocable license; the plaintiff arguing that the license became irrevocable by estoppel and the defendants contending

that the plaintiff had not changed his position substantially in reliance upon the agreement.

■ We are of the opinion that the agreement created more than a license to cut timber. Although the agreement calls for payment per unit for poles and logs removed, we construe this provision to describe only the *method* of payment and not the buyer's *obligation* to pay. The agreement obligates the buyer to purchase "all" of the merchantable timber upon the described land. The buyer also obligates himself to begin logging operations promptly and to continue such operations "until such time as all the timber herein agreed to be purchased has been removed * * *." If plaintiff had failed to proceed diligently with the logging operation, or if at the termination of the removal period he should fail to cut all or any of the timber agreed to be purchased he would be subject to an action for breach of contract.

The defendants bound themselves to permit the removal of such timber for a period of three years. If the parties had intended that the buyer's interest was to be subject to revocation by the sellers there would have been no need for the three-year removal clause.

The provision calling for a selective logging operation permitting the sellers to designate the poles and logs which may be removed is not inconsistent with the existence of a binding contract for the sale of the timber. The provision is not to be construed as vesting in the sellers the uncontrolled discretion to designate the timber which they desire to sell. Such a construction is not consistent with other terms of the agreement, particularly the clause in which the sellers agree to sell all of the merchantable timber on their lands.

The privilege of designating the timber to be re-

moved and the order of removal is expressed in the agreement as descriptive of the term "selective logging operation." The latter expression is susceptible to a variety of meanings in the logging trade, none of which support the interpretation urged by the defendants. "Selection" as used in the logging industry is defined in "Forest Terminology" (1958 ed) published by the Society of American Foresters, Washington, D. C., as follows:

> "Removal of mature timber, usually the oldest or largest trees, either as single scattered trees or in small groups at relatively short intervals, commonly 5 to 20 years, repeated indefinitely, by means of which the continuous establishment of natural reproduction is encouraged and an uneven-aged stand is maintained.

Variations on the basic idea expressed in the above definition are noted in the dictionary referred to. Listed are the terms "economic selection," "economic log selection," "economic tree selection," "group selection," "maturity selection," "margin log selection" and "margin tree selection." See also the definition of "selective logging" in "Woods Words" by McCulloch.

■ It is quite common in this state to draft timber contracts with a provision reserving to the seller the privilege of designating trees to be cut or areas to be logged. Frequently, such provisions are designed to control the cutting of timber in areas where younger trees or trees reserved for seed might be damaged by careless cutting practices. By reserving the control over cutting practices the seller is able to perpetuate his timber crop for further harvest. From the evidence in the instant case it is apparent that the provision reserving to the sellers the privilege of designating the poles and logs to be removed and

the order of their removal was inserted for such a purpose. We hold that this provision merely reserved to the defendants the power to make a reasonable proscription in designating the timber to be cut. They could not prohibit the plaintiff from cutting merchantable timber, the removal of which would not unreasonably damage the younger trees. The determination of a reasonable logging operation in this respect could be made by a third person acquainted with the business of logging. A substantial part of the timber covered by the contract was logged pursuant to defendants' designation. If defendants have not already fully indicated to plaintiff the timber yet to be cut and the order of removal, the decree of the lower court does not preclude them from making such further designation.

■ The defendants contend that plaintiff logged in a prohibited area and in doing so unreasonably damaged small trees which the alleged proscription was intended to protect. The plaintiff denies that he failed to follow the defendants' directions in cutting and denies that unreasonable damage was done. A disinterested third person supports plaintiff's position. In an effort to resolve their differences the parties employed Mr. Elmer Jensen, an experienced timber cruiser to work out a logging plan which would be satisfactory to both parties. Jensen did not submit a plan because as he said, "Mr. Yarborough had apparently made up his mind that he didn't want anybody to log there and therefore I never did it." Jensen further testified that "he couldn't see any undue damage" in the area alleged by defendants to have been restricted. The trial judge accepted this version of the matter. We also accept it. It follows that the defendants were not entitled to invoke the forfeiture provision of the contract.

Having concluded that a valid contract for the sale of the timber was created, we must determine whether the trial court erred in granting an injunction prohibiting defendants from interfering with plaintiff's logging operations on defendants' land. Defendants argue that the injunction in this case is tantamount to a decree of specific performance of the agreement. We shall proceed on this assumption. It is urged that since the subject matter of the agreement is personal property, not of a unique nature, specific performance is not an appropriate remedy. We agree with the defendants' position that the subject matter of the contract was personal property. The contract obligates the buyer to commence logging operations promptly and "to continue said logging continuously and diligently * * * until such time as all the timber herein agreed to be purchased has been removed from the above described premises." This language imposes upon plaintiff the contractural obligation to remove the timber. Undoubtedly the provision was designed to implement that part of the contract calling for payment as the timber was removed by providing the seller a remedy prior to the expiration of the removal period if the buyer failed to proceed diligently with the cutting. Whatever its purpose, it constitutes an agreement to sever and presents us with the question of whether the language brings the contract within the Uniform Sales Act, ORS ch 75. Under ORS 75.760 "goods" are defined as follows:

> " 'Goods' include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale."

Since, under the contract before us, the timber was "agreed to be severed" we must decide whether timber is included in the definition of "goods" under ORS 75.760.

Considering the extent to which the Uniform Sales Act has been adopted by the various states, it is surprising that there is such a paucity of cases interpreting the section in question. In those states in which the fiction of constructive severance is recognized the courts can, of course, reach the conclusion that standing timber may be regarded as goods without relying upon the statutory definition. *Patton v. Lucy,* 285 Ky 694, 148 SW2d 1039 (1940) ; *Napier v. Baker,* 235 Ky 724, 32 SW2d 49 (1930) ; *Marshall v. Lowd,* 147 A2d 667, 154 ME 296; *McCastle v. Scanlon,* 337 Mich 122, 59 NW2d 114 (1953) ; *Havens v. Pearson,* 334 Pa 570, 6 A2d 84, 122 ALR 512 (1939). See also, *Elmonte Inv. Co. v. Schafer Bros. Logging Co.,* 192 Wash 1, 72 P2d 311 (1937).

■ But the other states not adopting the constructive severance fiction have, with few exceptions, disregarded the definition section of the Uniform Act in deciding whether a contract for the sale or a sale of timber is real or personal property. This avoidance of the statute would be explainable if it were ambiguous or if its legislative history or the purpose of its enactment were clouded. But quite the contrary is true. The history of the section is set out in our own case of *Reid v. Kier, et al.,* 175 Or 192, 203, 152 P2d 417 (1944). There it is pointed out that the source of the Uniform Sales Act was the English Sale of Goods Act adopted in 1893. We learn from Williston (one of the draftsmen of the Uniform Sales Act) that the English act was intended to state the previously existing law announced in *Marshall v. Green,*

1 CPD 35 (1875). 1 Williston on Sales (rev ed) 158, § 62. In that case there was an oral sale of thirty-two trees "to be got away as soon as possible." It was held that "where the thing sold is to derive no benefit from the land and it is to be taken away immediately, the contract is not for an interest in land." It clearly appears, then, from the derivation of our statute that timber was intended to be included in the definition of "things attached to or forming part of the land" under the circumstances recited. This is the interpretation given to the act in 1 Williston on Sales (rev ed) 158, § 62:

> "* * * the Sales Act, copying as it has, the definition of "Goods" so far as concerns this question, from the English statute, has adopted the English rule that *any growing object attached to the soil* is to be treated as goods, if by the terms of the contract it is to be immediately severed." (Italics supplied)

The English and Canadian cases interpreting the corresponding section of the Sale of Goods Act indicate that the courts in those jurisdictions regard a sale of timber where prompt severance is contemplated as within the statutory definition of goods. In *James Jones & Sons, Ltd. v. Earl of Tankerville,* LR 2 Ch 440, 445 (1909), a case involving a contract for the purchase of standing timber the court said:

> "Lastly, in determining the effect of such a contract at law the effect of the Sale of Goods Act, 1893, has now to be considered. Goods are there defined in such a manner as to include growing timber which is to be severed under the contract of sale, whether by the vendor or the purchaser, and s. 52 of the Act seems to confer on the Court a statutory power of enforcing at the instance of a purchaser specific performance of a contract for the sale of ascertained goods, whether or not the property has passed by the contract.

"I come to the conclusion, therefore, that the Court has ample jurisdiction to grant the injunctions asked for, though, of course, it is in its discretion, if it so thinks fit, to award damages in lieu of relief by way of injunction. Under the circumstances of this case, however, there is, in my opinion, every reason for not exercising this discretion."

In *Fredkin v. Glines,* 18 Man 249, 252 (1908), the subject matter of the contract was growing hay but the court discussed the applicability of the definition section of the Manitoba Sales Act to timber. It said:

"The definition of the word 'goods' in the English Act is the same as that in the Manitoba Act. By this definition we are to consider as goods things attached to, or forming part of, the land which are agreed to be severed under the contract of sale. It appears to me that by this definition the intention of the parties as evidenced by the contract is the determining factor in arriving at the conclusion whether the article in question is, or is not, a chattel. If, therefore, growing trees, or natural grass, be sold for the purpose of being cut and taken away, pursuant to the contract, they are goods under this definition. There does not appear to be any limit of time imposed by the statute within which the intended severance is to take place. The question is well discussed in Benjamin on Sales, 5th ed. 190."

In *Hingley v. Lynds,* 44 DLR 743 (1918), although the court was divided on the manner in which their Sales Act should apply, there was agreement in assuming that timber was intended to be included under the definition of "goods" in the act. This is most clearly stated in the opinion of Ritchie, E. J.:

"I am of the opinion that s. 2 of the Sale of Goods Act, 1910, has changed the law with reference to the sale of standing trees and that such trees must now, in determining the rights of parties,

be treated as, and held to be, goods. I think it sets at rest a question which has long been a vexed one, giving rise to much difference of judicial opinion. Our Act is in the same terms as the English Act. In this case the trees were to be severed under the contract. In 25 Hals., p. 112, it is said:—

> "The Sale of Goods Act, 1893, relates only to goods as thereby defined, and the sale or transfer of other personal chattels is left to be regulated by ordinary law. For this purpose, unless the context or subject-matter otherwise requires, 'goods' include all chattels personal other than things in action and money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.

"In the note to the foregoing it is said:—

> "The concluding words of the definition appear to give a general rule for dealing with all things attached to the land, other than emblements and industrial growing crops, and to get rid of subtleties as to whether they were to be severed by buyer or seller, or whether they were to get any benefit from remaining attached to the land before severance. Under the Act the sole test appears to be whether the thing attached to the land has become by agreement goods, by reason of the contemplation of its severance from the soil."

In the American cases there is some support for the view expressed in the preceding cases. In *Palmer v. Wahler,* 133 Cal App 2d 104, 285 P2d 8 (1955), the court held that standing timber was "goods" under the Uniform Act. The court said:

> " * * * In California, under the provisions of Civil Code, sections 658 and 660, standing timber purchased separately from the land under a

contract for severance, thereby becomes personalty for all purposes depending upon the contract of purchase. As pointed out by both parties in their briefs, the legal status of standing timber is not uniform through the several states, and in California there are no decisions directly upon the point involved here. However, the language of Civil Code, sections 658 and 660, is in our opinion quite clear and explicit, and regardless of what the rule is elsewhere, we are satisfied that as to those claiming under or by reason of a contract of sale, the California rule is that where standing timber is purchased separately from the land for the purpose of severance, it must thereafter be considered as 'goods' or personal property. See also Davis v. McFarlane, 37 Cal. 634."

In *Gambee v. Argendorf,* 171 NYS2d 662 (1958), plaintiff sued defendants for specific performance of a contract under which plaintiff was to purchase certain timber on the defendants' land. During the pendency of that suit plaintiff sought to enjoin the defendant seller and others from removing timber from the seller's land pendente lite. The court denied the relief requested basing its decision on the ground that the timber sold was personal property and, therefore, that the remedy at law was adequate. The court said:

"* * * Prior to the enactment of the Uniform Sales Act, a contract for the sale of anything attached to the land, if the severance was to be made by the buyer, constituted a sale of an interest in real property and was required to be in writing. Thomson v. Poor, 57 Hun 285, 10 N.Y.S. 597; Volk v. Olsen, Sup.Ct.App.Term 1907, 54 Misc. 227, 104 N.Y.S. 415. However, under Section 156 of the Personal Property Law the word 'goods' includes all chattels personal other than things in action and money including emblements, industrial growing crops, and things attached to or forming part

of the land which are agreed to be severed before sale or under the contract of sale. The timber involved herein is a thing attached to and forming part of the land, and the contract pleaded herein, as well as the version of the arrangement by the defendants required the timber to be severed from the land immediately under the contract of sale.

Therefore, it was 'goods or personal property' and not real property." 171 NYS2d at page 663.

In *Rankin v. Ridge,* 53 N M 33, 201 P2d 359 (1948), the court made the following statement concerning the applicability of the Sales Act to timber sales:

"The tendency of the later decisions is toward the holding that if the sale is made upon the condition that the trees are to be 'immediately severed' from the soil, as the phrase has been defined herein, the contract is not within the fourth section of the Statute of Frauds. This view was adopted by the authors of the uniform sales act, Williston on Contracts, Sec. 521, which, however, has not been adopted here."

In *Jens v. Habeck,* 259 Wis 338, 48 NW2d 473 (1951), a case involving a sale of growing nursery stock, the court stated at page 474 that

" * * * the Uniform Sales Act has changed the law in Wisconsin so that industrial growing crops, growing trees and other nursery stock 'attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale' are to be considered 'goods' and are consequently personal property."

Although, as pointed out in 36 Marq L Rev 279, 289 (1953), the decision in the Jens case did not hold that the previous timber cases in Wisconsin were overruled, the opinion contains the intimation that those cases would not be adhered to in the future. See also *Willard v. Higdon,* 123 Md 447, 91 A 577 (1914).

Both English and American text writers have regarded the section as embracing timber. Benjamin on Sales (7th ed), ch II, pp 181 et seq. carefully traces the development of the law relating to the sale of growing things attached to the soil, including the law relating to timber. In commenting upon the effect of the Sale of Goods Act he states:

"* * * this enactment seems equivalent to declaring that under a contract of sale things attached to or forming part of the land, whether the property is to pass to the buyer before or after severance, are to be deemed 'goods.' If this construction be correct, the enactment has removed all doubt with regard to fixtures, and has certainly altered the law with regard to buildings sold as materials, and with regard to *fructus naturales*. If the parties agree that such things shall be severed, they thereby become 'goods'."

See also Blackburn on Sale (Canadian ed) pp 6, 16.

Burdick on Sales (3rd ed) p 30 says:

"* * * The language of the Uniform Sales Act, quoted in the preceding paragraph, seems to declare that growing trees, buildings, and other things forming part of the realty, may be converted into 'goods,' and thus brought within the seventeenth section of the Statute of Frauds (or its present equivalent), not only when it is agreed that title shall pass after severance, but also when the contract is one of present sale; if such contract provides for severance."

Tiffany on Sales (2d ed) p 76 is to the same effect:

"Sales Act, § 76 (1), following the English act, declares that 'goods' includes 'things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.' So far as concerns fructus naturales, buildings sold as materials, and fixtures, which are agreed to be severed before sale, this declares what has been

the general rule. The provision that these things are goods when agreed to be severed 'under the contract of sale' seems equivalent, as has been pointed out, to declaring that under a contract of sale they are to be deemed goods, whether the property is to pass before or after severance, and changes the law with regard to buildings sold as materials and fructus naturales. Benj. Sales (5th Eng. Ed.) 190."

Vold on Sales (2d ed) 96, 97, § 16, discussing oral contracts for the sale of timber makes the following statement:

"The view that such deals are deals for goods was codified in the definition of 'Goods' in the English Sale of Goods Act. The Uniform Sales Act copied this definition from the English Act. This view is also, in effect, taken in the Restatement of Contracts."

After noting the confusion in the cases dealing with contracts for the sale of timber as real or personal property, Vold states that the Sales Act has "sometimes" been relied on to support the position that timber is personal property under such circumstances. Vold, p. 97. Finally, he concludes as follows:

"The definition of 'goods' in the Uniform Sales Act is very broad. It covers both chattels and growing crops. It also includes, among other matters, the following:

" ' . . . things attached to and forming part of the land which are agreed to be severed before sale or under the contract of sale.'

"To this extent the Uniform Sales Act definition of 'goods' covers deals both for cultivated crops and for natural growths. So, too, does the 'goods' section of the Restatement of Contracts." Vold on Sales (2d ed) p 98.

Williston's view has been set out above. Inasmuch as he was one of the principal draftsmen of the Uni-

form Sales Act his comment is particularly significant in arriving at the meaning of the section in question.

The most recent treatment of the problem is found in Falk, Timber and Forest Products Law (1958). After commenting on the case of *Marshall v. Green,* supra, Falk continues as follows, at page 27:

> "Following this decision there is a maze of cases both in England and America that tread a close line and make it extremely difficult in any given instance to determine whether timber that is the subject of a contract and sold separately from the land is personal or real property.  *  *  *
>
> "The confusion in England was finally resolved (with some problems still remaining, however) by the adoption in that country of Section 62 of their Sale of Goods Act providing that personal property included 'things attached to or forming part of the realty which are agreed to be severed before sale or under the contract of sale.' No doubt timber that does not qualify under that section as personal property is to be classed as real property.
>
> "This history is of particular importance in America because our Uniform Sales Act, Section 76, adopted by seventy-five percent of our states, utilizes the exact same language (except for the substitution of the word 'land' for 'realty'). Several states not adopting the Uniform Sales Act nevertheless do follow this rule; thus, it is almost the universal law of our land. It is to be noted carefully that decisions rendered in states prior to adoption of the Act may not be followed since adoption and a different conclusion may be reached if a similar problem again arises.
>
> *  *  *  *  *
>
> "*  *  * most courts refused to follow the *Marshall v. Green* case. Because of the apparently greater number of these cases, most of the leading legal works today continue to say that ordinarily standing timber is to be treated as real property. *  *  *

"Recently, however, some courts have revised their position because of the effect in their state of the adoption of the Sales Act provision mentioned. More states, and eventually all, will have to decide squarely the effect that the Uniform Sales Act has in their states. A surprisingly large number of state courts have discussed the status of timber as real or personal property without mentioning the Uniform Sales Act provision; this has even led to a charge that the courts are conspicuously avoiding facing the issue squarely. These courts usually refer to and rely upon earlier decisions, and the leading legal works mentioned, which in turn did not consider the Sales Act provision."

The writers in legal periodicals uniformly recognize that the definition of "goods" in the Uniform Sales Act was intended to include timber under the circumstances recited in the act. Thus, in a note in 6 Cornell L Q 426 (1921) commenting on *Schaap v. Wolf,* 173 Wis 351, 181 NW 214 (1921) which held that timber which was to be severed under a contract of sale was an interest in the land, the writer states:

"The court in its opinion made no reference whatsoever to section 76 of the Uniform Sales Act which has been adopted by Wisconsin. That section defines goods as including 'all chattels personal other than things in action or money. The term includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.' The language of this section seems quite unambiguous upon its face and would seem applicable to any contract for the sale of standing timber or *fructus naturales* which either expressly or impliedly contemplates a severance from the soil either by the seller or the purchaser at some time in the future. So construed the section would embrace practically all contracts of this kind, for it is very rare that a sale of trees or

*fructus naturales* is made where severance within a fairly short time is not intended. This definition of goods was undoubtedly inserted in the Act for the purpose of doing away with the diversity of opinion existing in the different states on this point at common law. While there appears to be no authority construing this particular provision of the Sales Act, many of the leading text-writers have made special note of the change."

The following quotation is from Scott: Specific Performance of a Contract to Sell Standing Timber For Immediate Severance, 17 Ky L J 48, 49 (1928):

" * * * Where the Sales Act has been adopted there certainly should be no doubt as to the status of such contracts [for the sale of timber]. Section 76, which is an exact copy of Section 62 of the English Sale of Goods Act of 1893, provides that the term 'goods' includes 'emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under contract of sale.' Unquestionably there is no ambiguity couched in this phrase, and it is hard to see how any court deciding a case involving a sale of timber for immediate severance could go astray in its interpretation."

In an article entitled Washington Timber Deeds and Contracts in 32 Wash L Rev 30-40 (1957), Professor Ralph Johnson, in discussing the Sales Act, says:

" * * * The applicability of this statute to timber transactions apparently has been overlooked by practitioners and courts in this state for many years. None of the Washington cases decided since its adoption in 1925 has ever mentioned the Sales Act. But even a brief examination of the wording of Section 76 of that act indicates quite clearly that sales of standing timber were meant to be included thereunder. * * * Of course, one might argue that this section is only applicable to that small number of timber sales where the purchaser

is under a duty to remove the timber (on the theory that this is what is meant by 'under the contract of sale'). Such an argument is obviously weak. It might be argued that the drafters of the act had some other type of transaction in mind and did not intend to include sales of standing timber. This argument is also weak, particularly in view of the comments of the best known authority on the subject (and one of the principal draftsmen of the act), Professor Samuel Williston, who has indicated quite clearly that the Sales Act was intended to include sales of standing timber."

The most comprehensive treatment of the problem is found in an article by John M. Grogan in 36 Marq L Rev 279 (1953) entitled "Sales—The Effect of The Uniform Sales Act on Contracts for the Sale of Standing Timber." There it is shown that the section defining "goods" in the English and American Sales Acts was derived from the rule in *Marshall v. Green,* supra:

"The intention of the English Act was not to revise or reform the then existing law governing the sale of goods but rather to restate it. Therefore, as Williston suggests the Act copying as it has the English Act must have intended to adopt the English common law as laid down in Marshall v. Green." 36 Marq L Rev 279, 284.

See also 6 U Pitt L Rev 49 (1939); 79 Cent L J 421 (1914).

In our own timber sales cases we have made the assumption that if the circumstances of the sale of standing timber bring the transaction within the terms of the act the timber will be regarded as "goods." In *Reid v. Kier,* 175 Or 192, 152 P2d 417 (1944), to which we have already alluded, the court interpreted the act to be applicable only if the purchaser was obligated to sever the timber. The contract involved

in that case did not require severance by the purchaser, and the court decided that the act was not applicable. Although the court referred to the unsettled state of the law on the subject and did not definitely make a choice of the two views expressed, it seems clear that if the contract before the court had required severance the act would have been applied. The case is so interpreted by others. See for example, Falk, Timber and Forest Products Law §§ 32, 86; *Oregon Lumber Co. v. Commissioner of Internal Revenue*, 20 T C 192 (1953).

A clearer recognition of the applicability of the act to timber sales is found in *U. S. Plywood Corp. v. Alexander*, 180 Or 174, 175 P2d 460 (1946). There the question was presented as to whether the purchaser's interest under a contract for the purchase of standing timber was subject to redemption after sale on foreclosure of a lien on his interest. The court said that assuming the purchaser's interest was an estate in real property it was at most an equitable estate and as such it would not be subject to redemption. But the court then said:

> "We have assumed that the contract between the defendant and Johnson and Farley created in the defendant an interest in land. *It is unnecessary to decide whether that assumption is correct.* The Uniform Sales Act provides that the term 'good' 'includes emblements, industrial growing crops, and things attached to or forming part of the land which are agreed to be severed before sale or under the contract of sale.' O.C.L.A. § 71-176. The agreement between the defendant and Johnson and Farley provided that the defendant should commence logging operations as soon as practicable and 'carry on said operations as continuously as weather, market and labor conditions permit until the complete removal of the merchantable timber on said prem-

ises,' but 'not later than July 19, 1946.' " (Italics supplied) 180 Or at page 180, 181.

From the foregoing statement it would seem clear that the court did not rest the decision on the assumption referred to but turned to the Sales Act for the rationale. However, doubt is cast upon this conclusion as a result of the concluding language in the opinion where the court states:

> "If under the statute and agreement the timber is to be deemed personal property, then no citation would be necessary to demonstrate that the sale thereof should be without right of redemption. Upon either theory the decree of the circuit court was right." 180 Or at 181.

At any rate, it seems clear that *U. S. Plywood Corp. v. Alexander,* supra, definitely recognizes that the Sales Act is applicable to sales of standing timber, and that had there been no basis for regarding the purchaser's interest as an equitable interest in real property the court would have rested the decision on the theory that the timber was personal property under ORS 75.760. It will be noted that the court specifically called attention to the part of the agreement requiring the purchaser to remove the timber, a sine qua non for the application of ORS 75.760 according to *Reid v. Kier,* supra.

In *Seguin et al. v. Maloney-Chambers,* 198 Or 272, 253 P2d 252, 256 P2d 514 (1953) the statement was made that "The Uniform Sales Act relating to personal property does not apply to standing timber." *Reid v. Kier,* supra, was cited as authority for this statement. The citation of the Reid case indicates that the court merely meant to say that if, as was true in that case, the contract does not come within the requirements of ORS 75.760 (e.g., where there is

no obligation to sever) the statute does not apply. In the Seguin case the transaction involved an outright conveyance of timber with no provision for severance. Under the rule laid down in *Reid v. Kier*, supra, ORS 75.760 would not apply.

■ On the basis of our previous cases it is reasonable to conclude that we have recognized that a contract for the sale of timber requiring severance by the purchaser brings the transaction within the Sales Act. Although no mention has been made in these cases of a requirement that the severance called for must be prompt, this requirement is regarded as impliedly a part of the statute, and we so regard it. 1 Williston on Sales (rev ed) 158, § 62.

Considering the legislative history of the definition section of the Uniform Sales Act and the clearly evident purpose to include timber within the section, we have no choice but to give effect to that purpose. It is not for us to determine whether it was wise for the legislature to make applicable the law of sales of personal property to the timber transactions covered by the statute. It has been said that the treatment of timber as personal property under the circumstances contemplated by the Sales Act is preferable to the view that such timber remains real property. 6 Cornell L Q 426 (1921); Scott, Specific Performance of a Contract to Sell Standing Timber for Immediate Severance, 17 Ky L J 48 (1928); 36 Marq L Rev 279 (1953). This, of course, is the position taken by the courts which have adopted the fiction of constructive severance. *Pope v. Barnett,* 45 Ga App 59, 163 SE 517, 170 SE 710, 177 SE 358 (1932); *Patton v. Lucy,* 285 Ky 694, 148 SW2d 1039 (1940); *McCastle v. Scanlon,* 337 Mich 122, 59 NW2d 114 (1953); *Wade v. Day,* 232 Mich 458, 205 NW 225 (1925);

*Kingsley v. Holbrook,* 45 N H 313, 86 Am Dec 173 (1864); *Rankin v. Ridge,* 53 N M 33, 201 P2d 359 (1948); *Havens v. Pearson,* 334 Pa 570, 6 A2d 84, 122 ALR 512 (1939); *Fish v. Capwell,* 18 R I 667, 29 A 840 (1894); *Hurley v. Hurley,* 110 Va 31, 65 SE 472 (1909). See also 1 Restatement, Contracts, § 200. If the legislative policy expressed in ORS 75.760 is unwise the change must come from the legislature and not from this court.

■ Simply because there is a contract for the sale of personal property it does not necessarily follow that the defendants can be enjoined from preventing the plaintiff to enter their lands. As pointed out in 2 Corbin, Contracts 411, § 408.

> "* * * The vendor may be held to have the power to revoke the license to enter and cut the timber, even though it is the breach of an enforceable contract to exercise the power."

If, however, the plaintiff acquired an interest in the timber before severance, the interest would carry with it the irrevocable privilege to enter. This privilege is generally described as a license coupled with an interest. Once created it has all the legal characteristics of an easement, including irrevocability. *Coghlan v. Miller,* 106 Or 46, 211 P 163 (1922); 5 Restatement, Property, §§ 513 et seq.; Clark, Covenants and Interests Running with Land (2d ed), p 36, et seq.

■ We must decide, then, whether the contract in the instant case created in the plaintiff a property interest in the timber. Had there been no clause reserving to the defendants the power to designate the timber to be logged the contract would have resulted in a present sale of the timber described, operating to transfer the title at the time of the execution of the contract. *Pulkrabek v. Bankers' Mortgage Corp.,* 115

Or 379, 238 P 347 (1925); ORS 75.190; 2 Williston on Sales, § 264; Vold on Sales (2d ed), § 24. The question is whether the power of designation reserved in the sellers could be regarded as postponing the passage of title until the designation was made. The contract embraced all of the merchantable timber on the land except those trees the removal of which would cause unreasonable damage to the unmatured trees. As we have already stated, the designation of the trees capable of removal without serious damage could be made in accordance with objective standards. That being true the title could be regarded as passing upon the execution of the contract. *Logan v. Cross,* 101 Or 85, 198 P 1097 (1921); Vold on Sales (2d ed), § 27, pp 151 et seq. But even if it could be said that the future identification of the trees prevented the complete title from passing, we think that the contract should be regarded as creating in the plaintiff some form of property interest in the timber. Were we to apply without question the traditional common law property concepts we would describe the plaintiff's irrevocable privilege to remove the timber as a profit a prendre. 34 Or L Rev 256; 25 Or L Rev 217; 19 Austl L J 183; cf., Falk, Timber and Forest Products Law, § 36; 2 Corbin, Contracts, § 408. It is not necessary for us to decide the extent to which the law of profits is adaptable to the various transactions in this state involving the sale and removal of timber for commercial purposes. But we believe that we are justified in looking to that law by way of analogy in describing the plaintiff's interest in the present case. Obviously, since ORS 75.760 converts plaintiff's interest into "goods" we could not, if we would, describe the interest as a profit because a profit empowers the holder to remove a part of the land only. But

the legislative conversion of timber into goods does not preclude our employment of the concept of profit a prendre by analogy to support the view that a property interest in the timber vests in the plaintiff under circumstances such as we have here. Having decided that the plaintiff has a property interest in the timber, his privilege to remove it becomes a so-called license coupled with an interest and is irrevocable.

■ Even though we were to hold that the plaintiff did not acquire an interest sufficient to create an irrevocable license to remove the timber, there is yet another basis upon which we would be entitled to relief. Ordinarily a contract for the sale of a chattel does not entitle the buyer to specific performance. In the absence of statutory modification, the same rule would apply where timber is regarded as personal property. 5 Corbin, Contracts, § 1144, p 643. However, since the Uniform Sales Act specifically deals with the remedies of the parties to sales transactions, we must look to it for the scope of relief available to the plaintiff. ORS 75.680 provides as follows:

> "*Specific performance.* Where the seller has broken a contract to deliver specific or ascertained goods, a court having the powers of a court of equity may, if it thinks fit, on the application of the buyer, by its judgment or decree direct that the contract shall be performed specifically, without giving the seller the option of retaining the goods on payment of damages. The judgment or decree may be unconditional, or upon such terms and conditions as to damages, payment of the price and otherwise, as to the court may seem just."

This section of the Uniform Sales Act has received various interpretations in the states adopting the act. See Masterson: Specific Performance of Contracts to Deliver Specific or Ascertained Goods Under the

English Sale of Goods Act and the American Sales Act, Legal Essays in Tribute to Orrin Kip McMurray 439; 3 Williston on Sales, §§ 601, 602 (rev ed 1948, Supp 1959); 28 Or L Rev 285 (1949). In some states it is held that the section of the Uniform Sales Act set out above is merely declaratory of the common law and that specific performance will not be granted unless the chattels involved are unique or other equitable grounds justify specific relief. Other states hold that the statute expands the remedy of specific performance. The matter is thoroughly treated by Mr. Justice ROSSMAN in *Pittenger Equipment Co. v. Timber Structures, Inc.*, 189 Or 1, 217 P2d 770 (1950). In that case our statute was construed to expand the remedy of specific performance with respect to contracts for the sale of personal property so as to include relief where the chattel was not unique but "where an action for damages would be a manifestly deficient remedy." 189 Or at page 23. The court held that a contract for the sale and purchase of lumber was specifically enforceable by a buyer who had agreed to accept lumber in satisfaction of a debt owed to him by the seller.

We think that there are equally good reasons for granting specific relief in the instant case. Although timber or the logs cut therefrom may not be regarded as unique "chattels," we can take judicial cognizance of the fact that it is becoming increasingly difficult for small operators such as the plaintiff to obtain tracts of timber within their purchasing power. The scarcity of a chattel has been recognized by courts of equity as an important factor in determining whether specific performance will be granted. *Fraser v. Cohen,* 159 Fla 253, 31 So2d 463 (1947); *Michigan Sugar Co. v. Falkenhagen,* 243 Mich 698, 220 NW 760 (1928);

*Curtice Bros. Co. v. Catts,* 72 NJ Eq 831, 66 A 935 (1907); 3 Williston on Sales (rev ed 1948) § 602, p 328; 28 Or L Rèv 285 comment on *Heidner v. Hewitt Chevrolet Co.,* 166 Kan 11, 199 P2d 481 (1948). See Falk, Timber and Forest Products Law, p 185.

Specific performance has been recognized as an appropriate remedy in cases not unlike the one before us. In *Strause v. Berger et al.,* 220 Pa 367, 69 A 818 (1908) plaintiff purchaser sought specific performance of an oral contract for the sale of timber. Defendants contended that there was no jurisdiction in equity on the ground that the remedy at law was adequate. The court said:

> "The timber is to be regarded as personal property, and not as an interest in land, because of the intention of the parties to the agreement that the cutting of it should commence at once and be completed within a reasonable time. * * *
>
> "* * * Ordinarily a complete remedy may be had in an action at law for the breach of such a contract as that under consideration, but in this case we have the finding that the timber had a special value to the plaintiff for the use for which he bought it, because of its quality and *because of the difficulty of procuring such timber in the locality in which his business was conducted.* The case does not differ in principle from that of Vail v. Osburn, 174 Pa. 580, 34 Atl. 315, where a contract to cut and deliver bark to a tannery from trees in proximity to it was enforced." (Italics supplied)

See also *James Jones & Sons, Ltd. v. Earl of Tankerville,* LR 2 Ch 440 (1909), where the court recognized that under the section of the English Sale of Goods Act corresponding to ORS 75.680 the court had "a statutory power of enforcing at the instance of a purchaser specific performance" of a contract for the sale of timber. LR 2 Ch at page 445.

Equity will also grant specific relief where there "is difficulty and uncertainty in making an accurate valuation of the subject matter involved, in determining the effect of a breach, and in estimating the plaintiff's harm." 2 Restatement, Contracts, § 361, p 646. In the instant case, if plaintiff is not permitted to continue logging the timber in question the computation of his damages will be difficult. This is not a case where a buyer is damaged simply by the seller's failure to deliver goods. Here the plaintiff has made expenditures for the construction and maintenance of logging roads, the construction of landings, and for other items incident to setting up the logging operation. The measure of damages which would compensate plaintiff for the breach of the contract is not readily ascertainable. We think that this is the type of situation which calls for specific enforcement in accordance with the rule stated in section 361 of the Restatement of Contracts quoted above. For the foregoing reasons we hold that the trial court was justified in granting the plaintiff's prayer for an injunction. See *Omaha Lumber Co. v. Co-operative Inv. Co.*, 55 Colo 271, 133 P 1112 (1913).

The defendants argue that plaintiff should be denied equitable relief because the decree would be impracticable or impossible to enforce in view of the fact that defendants must make a selection of the timber to be removed. We think that there are sufficient objective standards upon which the court would be prepared to judge whether performance by either party complied with the contract. A similar argument was advanced in *Omaha Lumber Co. v. Co-operative Inv. Co.*, supra, which the court answered as follows:

"It is further urged that the timber contracted for was to be 'merchantable timber' and that this

required the exercise of judgment and discretion upon the part of those who were to make the computation. This contention cannot be sustained. The term 'merchantable' is one in common use and ascertainable by proof. Hayes v. McLin, 115 Ky. 39, 72 S.W. 339; Tenny v. Mulvaney, 9 Or 405; Michigan Iron and Land Co. v. Mester, 147 Mich .599, 111 N.W. 177; Teachout v. Clough, 143 Mo. ·App. 474, 127 S.W. 672." 133 P at page 1117.

Defendants' argument that specific performance should be denied because there was no mutuality of remedy lacks merit. It is argued that since defendants could not have obtained a decree requiring plaintiff to complete his performance there is a lack of mutuality. The fact that specific enforcement is not available to the defendants is not a sufficient reason for refusing it to the plaintiff. 2 Restatement, Contracts § 372, p 677. The most workable doctrine of mutuality is that stated in 5 Williston on Contracts (rev ed 1937) § 1440, pp 4022, 4023. There it is said:

"* * * Where the contract is executory on both sides, the court may still give specific performance if it is satisfied that the person seeking relief will continue to perform. This may be shown by past conduct; or the person seeking specific performance may have such a strong economic interest in the carrying out of the contract by reason of extensive investment of his funds and labor that default on his part is highly improbable."

This view of the doctrine of mutuality has been endorsed by this court. *Temple Enterprises v. Combs*, 164 Or 133, 100 P2d 613, 128 ALR 856 (1940). We believe that there is sufficient evidence in the present case to afford reasonable assurance that plaintiff will continue with the performance of the contract.

The three-year period for removal provided for in the contract has expired. The plaintiff is entitled

to a reasonable time within which to complete the logging operation on defendants' land.

The decree of the lower court is affirmed.

McAllister, C. J., concurs in the result.