**TIMBER CONSERVATION COMPANY,**
an Oregon corporation, Plaintiff,

v.

The **UNITED STATES** of America,
Defendant.

Civ. No. 60–209.

United States District Court
D. Oregon.

June 25, 1962.

King, Miller, Anderson, Nash & Yerke, Orval O. Hager, Clifford N. Carlsen, Jr., Portland, Or., Comfort, Dolack & Hans-

ler; John F. Hansler, Tacoma, Wash., for plaintiff.

Sidney I. Lezak, Acting U. S. Atty., Joyle Dahl, Department of Justice, Washington, D. C., for defendant.

EAST, District Judge.

The plaintiff, Timber Conservation Company (TCC), in this action seeks the refund of certain portions of its income tax payments, together with accrued interest thereon, for the tax years 1952, 1953 and 1955.

## TCC'S STATUS

TCC may be characterized as an active, going, timber-holding company which buys and sells tracts of timber for investment and income purposes, and is one of several corporations, with interlacing business transactions, which are under a common capital stock ownership by three persons. These stockholders constitute the Board of Directors and officers of the pertinent corporations. The other corporations under this common capital stock ownership and interlaced in most of the transactions herein are Cheney Oregon, a corporation engaged primarily in the business of a broker of forest products (Cheney Oregon), Cheney Forest Products, a corporation engaged in the sawmill business (Cheney Products) and Cheney Spur Lumber Company, a second sawmill corporation (Cheney Spur). At the outset it is noted that the defendant United States of America (Government) has expressly abandoned and disclaims any contention that the corporations were not separate and distinct entities, independent going businesses, or that the transactions had between TCC and any of the other corporations were "sham." The only contention that the Government makes of the common stock-ownership and common directorships among the several corporations is that the course of action of TCC as shown by contracts involved indicates that there was in fact no "disposal" of the timber owned by TCC and involved herein within the meaning of the relevant sections of the Internal Revenue Codes (Code of 1939 and Code of 1954).

## RELEVANT PROVISION OF THE CODES

TCC's claim for refund attacks the Government's treatment of stumpage income over amount of cost to TCC (gain) from the asserted "disposal" of TCC's timber as ordinary income rather than as capital gain to TCC.

TCC cites as authority for the characterization of the gain as a capital gain § 117(k) (1) and (2) of the Code of 1939 (26 U.S.C.A. § 117(k) (1) and (2)) for the years 1952 and 1953, and § 631(a) and (b) of the Code of 1954 (26 U.S.C.A. § 631(a) and (b)). Since both statutes are the same in all material aspects, they will jointly be referred to for all years in question by citation to the "1954 Code," which provides, *inter alia:*

"§ 631. Gain or loss in the case of timber or coal.

"(a) *Election to consider cutting as a sale or exchange.—*

"If the taxpayer *so elects* * * * the cutting of timber (for sale or for use in the taxpayer's trade or business) * * * by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months * * *) shall be considered as a sale or exchange of such timber. * * *

"(b) *Disposal of Timber With a Retained Economic Interest.—*

"In the case of the *disposal* of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an ecomonic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. * * * *"
[Emphasis supplied.]

As it will later appear, it is not necessary to determine whether a proper election

under § 631(a) of the 1954 Code was made.

### DISCUSSION OF CONTRACTS

From approximately December of 1946 through December of 1955, TCC was engaged in the business of buying tracts of standing timber and holding them for investment and sale. During this same period, the brokerage company, Cheney Oregon, was operating as a lumber broker for many of the products produced by other operators in the area as well as the two sawmills under common control, Cheney Products and Cheney Spur. The methods by which TCC disposed of its timber may be broken down into two general contractual classifications, log-type contracts and tie-mill contracts.

Under the log contracts, TCC entered into a contract with a logger by which TCC agreed to sell the standing timber to the loggers, to be cut and removed within a specified period of time. In each case the contract contained a clause requiring that the logger deliver the logs produced from the timber to either Cheney Products or Cheney Spur. The required delivery of logs to the Cheney mills was subject to certain exceptions, such as inability on the part of the mills to receive the logs and adverse market conditions. Also, all white fir and old growth logs were to be delivered to other mills with the approval of TCC. In any case, where logs were delivered to mills other than the Cheney mills, TCC's consent was required. In practice, the logs delivered to other parties by the loggers varied from 10% to 18% of the total log production. Each contract was nonassignable, though not all contained forfeiture clauses in the case of assignment.[1] The record shows no case of an attempted assignment. The purchaser agreed to brand all logs if requested by TCC and also agreed to conform to all logging regulations and laws of the State of Oregon. The logger further agreed to pay all liens, encumbrances and taxes and to save TCC harmless from any of these obligations. Should these items have become in arrears, TCC was authorized to pay them and deduct them from the logger's stumpage payments. The price of the standing timber or "stumpage" was included in the contract, and according to the evidence in the case was arrived at in bargaining sessions between TCC's forester and the respective loggers. Other "boiler plate" provisions common to logging contracts were likewise included.

Executed simultaneously with the log sale agreement was a contract wherein the logger agreed with the respective mill to deliver all logs, with the exception of white fir and old growth, to that mill.[2] No other logs were to be taken elsewhere, and those that were designated for other mills were generally confined to companies which had the approval of TCC or the Cheney mill. The remainder of the contract was substantially the same as the log sale contract. Each of the log contracts used words of sale and purchase and there was no title reservation in TCC.

The tie-mill contracts involved logging operators to set up portable mills on TCC's timberlands and cut and roughsawed the logs into certain types of lumber, principally ties and studs. The tie-mill contracts were generally of a more restrictive nature than the log contracts. Every tie-mill contract, with three exceptions (Exhibits 56–A, 74–A and 50–A), had a clause reserving title in TCC, at least until the finished products were loaded onto cars for delivery to the ultimate consumer. A portion of these agreements stated that "Second Party shall acquire hereunder no interest in or to said land, * * * and no interest in and to said timber, except the right and

---

1. For the significance of the inclusion of such a clause in a contract of this nature see Giustina v. United States, 190 F.Supp. 303 (D.C.Or.1960).

2. A few of the contracts here were tripartite in the sense that both agreements were in one document, but as the majority were composed of two separate contracts, the latter form will generally be used for illustration.

privilege to manufacture and remove the same in strict compliance with the terms and conditions of this contract." These prohibitive clauses were found, in each case, with a later clause stating that title to the product would pass to the second party at the time of shipment. Words of "sale" and "purchase" or "buyer" and "seller" were not used in these contracts, as they were in the log-type contracts. The operators further agreed to use only the brokerage services of Cheney Oregon to market their products and authorized Cheney Oregon to deduct 5% of the gross sales price as their commission. Cheney Oregon was also authorized to withhold stumpage and other costs for TCC and to remit the balance to the operator.

Executed simultaneously with the tie-mill contract was an agreement with Cheney Oregon whereby the above mentioned marketing services were agreed to be performed.

It is within the frame of these contracts, as expressing the intent of the parties, tempered by the manner in which the parties operated thereunder, that the Court must determine whether TCC made a "disposal" of the timber during the years here involved.

## CONTENTIONS OF THE PARTIES

The Government's position is succinctly stated in its brief as follows:

"These agreements are in substance and effect exactly the same as agreements between an owner and a logger which provides that the logger is to receive a fixed amount for performing the services of falling, bucking, yarding, trucking and delivering, which were performed by the loggers in this case. There can be no doubt that, where the logger cuts the owner's timber for a given sum per thousand board feet cut, the owner is cutting his own timber and does not qualify under § 631(b)
\* \* \*

"\* \* \* The logger by the terms of the contract was to pay a specified price for the stumpage. He was to sell the logs at a specified price to one of taxpayer's related corporations or to another mill designated by taxpayer. The payments for the logs were to be made to taxpayer and only the net difference, readily computed, was to be paid to the cutter."

Finally, quoting further from the Government's brief:

"The crux of the Government's argument is that while taxpayer may not have retained in itself more than an economic interest in the timber after the logging contracts were signed, it did not dispose of these by the contract with the logger but disposed of these ownership rights indirectly to its related business corporations."

TCC's contentions are that (a) it was the owner of the timber, (b) that it made a disposal of the timber to the logger involved, (c) that such timber was held for more than six months prior to disposal, and (d) that it disposed of the timber under a form of contract wherein it retained an economic interest. The Government does not raise any serious question as to (a) TCC's ownership or (d) that TCC retained an economic interest in the timber.[3] The primary contention between the parties is as to the disposal question, with the ancillary issue of whether the timber was held more than six months being raised only as to a few tracts.

## CONCLUSION AS TO LOG-SALE CONTRACTS

■ Considering the log contracts first, it would appear to this Court that the issues raised as to these contracts must be decided adversely to the Government. None of the contracts had any reservation of title in the seller and by

---

3. The Government's brief indicates that, from its viewpoint, the problem is not that TCC failed to retain an economic interest, but rather that TCC retained too much of an interest without disposing of sufficient rights to qualify for capital-gains treatment.

the language used, clearly indicated that the parties intended a sale of the timber. Further, the existence of only a service contract is militated against by the Oregon law on this subject. The Oregon case of Paullus v. Yarbrough, 219 Or. 611, 347 P.2d 620, 79 A.L.R.2d 1222 (1960), indicates that under a contract similar in all material aspects to the log contracts in this case, the buyer-logger has a property interest in the logs which is specifically enforceable against the seller. Under the legal documents in this case, the Court is of the opinion that the loggers here had at least a "contract right to cut" the timber and that the taxpayer made a sufficient "disposal" of the timber to the parties under the log contracts. Also on this point, cf. Panushka v. Panushka, 221 Or. 145, 349 P.2d 450 (1960).

Buttressing this conclusion further are federal adjudications which support a finding of a "disposal," contra "ordinary income." The facts in the instant matter fall sufficiently within Gilmore v. United States, 180 F.Supp. 354 (Ct.Cl.1960) to support this Court's ultimate finding of a "disposal." Also, the cases of United States v. Johnson, 257 F.2d 530 (9 Cir. 1958) and Wirkkala v. United States, 181 F.Supp. 338 (W.D.Wash.1960) have determined substantially identical issues against the Government. The Johnson decision covers all aspects of the case at bar, *except* where the seller of the timber has a first right or option to purchase the logs sold. The Wirkkala case effectively closes that door by holding that a right of first refusal on behalf of the seller does not prevent a buyer from qualifying under § 631(a) of the 1954 Code. While this case and some others cited herein deal with the right of the buyer to claim capital gains treatment under § 631(a) of the 1954 Code, the tests of qualifying under one section by the purchaser and of qualifying under the other by the seller are so similar that cases under one section are valuable precedents in determining the law under the other, and this Court accepts them as such.

The treatment of the transactions by the parties is perhaps the strongest element of TCC's case, both as to the log and tie-mill transactions. Gus Priebe, one of the loggers involved in several of the contracts here in question, testified that he insured the timber himself under a blanket policy, carried the timber on his books as his own and delivered some logs to other mills and collected the stumpage himself. It is to be kept in mind that at all times material hereto the parties were not attempting to set up an advantageous tax situation. In fact, TCC reported the gains on these timber sales as ordinary income and is only now asserting the capital gain aspect of the transactions. For this reason, the Government's "course of conduct" argument concerning the related corporations loses much of its point.

It should be noted here that the Government did produce one witness, Mr. Carver, who testified that he did not think that the timber which he cut was his and that he was only logging on a service contract. On cross-examination, he admitted that the contracts which he had with TCC and Cheney Oregon were different from the usual service contract in that he had the risk of the market in the sale of his product. This evidence as to what Mr. Carver "felt" does not rebut the stronger evidence on the part of TCC which showed that most of the loggers, if not all (excepting Mr. Carver), treated the timber as their own in their business records and conduct.

Finally the Government contends that the price which the logger was to be paid was in reality only a fixed fee per thousand for their services. TCC showed, however, that the two prices, i. e., the price at which it sold to the loggers and the price which the loggers sold to the mills, was arrived at in bargaining sessions with the loggers and represented, at both ends, the going market price for the particular grade and type of timber involved. It is true that the logger could not take advantage of fluctuations in the market price, but there is no evidence that this was a bargaining factor in the negotiations or that the price reached was not a fair prediction of the market

trend over the period of time of the cutting under the contract. In any case, the loggers could and did bargain for the best price for all the old growth which the mills did not take and for any other trees as to which the loggers received consent to sell elsewhere.

## CONCLUSION AS TO TIE-MILL CONTRACTS

The closest questions presented here arise out of the tie-mill contracts under which about one-half of the operators worked. Contrasted to the logging contracts, practically all of the tie-mill contracts had security provisions in the contract.[4] The general provision, found in clause I of these contracts, provided that:

"It is understood that Second Party (logger) shall acquire hereunder no interest in or to said land, save and except the necessary easements and rights of way for the logging, manufacturing and removal of said timber, and no interest in and to said timber, except the right and privilege to manufacture and remove the same in strict compliance with the terms and conditions of this contract."

If this clause contained the only statement in the contract concerning the rights of the logger, then it would be clear that the Government's position is correct. TCC would have disposed of nothing under the contract, and only granted a right to the logger to work for TCC under a service-type contract. However, clause IX provided that:

"All logs, ties, unedged side cut cants and other forest products produced or manufactured from the above described timber shall be and remain the property of First Party (TCC) until the same have been removed from said premises and loaded in cars for shipment * . * * at which time title thereto shall pass

to Second Party upon such shipment * * *."

Were this latter clause the only limitation of or reservation on the passage of title, it would appear that under the holdings in Guistina v. United States, 190 F.Supp. 303 (D.C.Ore.1960) and Stanley Shaffer, Par. 60,186 P–H Tax Ct.Mem. (1960) that this reservation of title in the seller is only for security purposes and does not prevent the seller from making a "disposal" under the statute.

In resolving the ambiguity raised by these two clauses of the contracts, it is relevant and helpful to view the actions of the parties subsequent to the contract and before any controversy arose in order to determine the practical interpretation which the parties placed upon these terms and the contract as a whole. Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 178 F.2d 541 (9 Cir. 1949); 4 Williston on Contracts, § 623 (3rd ed., 1961).

TCC's witness O'Brien, under examination by the Court, testified that on any shipments of ties or studs, where there was a refusal of acceptance or an adjustment to be made, "Mr. Cheney handled the bookwork but we had to make it good." The Court interprets this statement as an indication that both parties believed the products to be the property of the logger, and that any defects in the products were the responsibility of the owners, in this case the loggers.

Mr. Dunn, a member of the Oregon State Bar and a practicing attorney, testified that when litigation arose over the performance under the form of contract in question, plaintiff's Exhibit 53–A, the parties in each case took the position that the timber products were the property of the buyer-logger. In one case, a tiemiller was selling timber to a third party and Cheney Oregon sued to enforce the brokerage provisions of its contract. TCC did not claim that the products were its property nor did Cheney Oregon make such a claim. The second case presented

---

4. The agreements shown in TCC's Exhibits 50–A, 54–A and 74–A do not have

any restrictions on title and fall within the same analyses as the log contracts.

even stronger evidence of the practical interpretations of the contract. After TCC had advanced money to a logger on a sale, the logger abandoned the job and TCC moved in to preserve their security and advances and cut some of the timber. TCC was then sued, evidently by the logger, on the grounds that TCC had *stolen* the logger's timber. The Court believes this to be strong evidence of the interpretation which the parties put on the contracts and the particular terms with which were are here involved. In each case, the Cheney companies and TCC disavowed ownership and the loggers asserted it.

Finally, there was admitted into evidence TCC's Exhibit 74–A which concerns certain contracts with tie-millers and the application of the Oregon timber severance tax. The letter, written before the controversy arose (August 21, 1947) was from TCC's accountant and stated that, in the future, TCC should not withhold the tax without permission of the loggers, since TCC was not the owner of the timber. Rather, the letter stated, the loggers were apparently the owners and were the ones engaged in the harvesting of the timber and were therefore liable for the payment of the tax. Whatever probative value a statement such as this may have, it is still another indication that the parties did not interpret or intend the contracts to retain title to the timber, at least for other than security purposes.

Mr. Dunn, who at the time of the contracts involved was an attorney for TCC, testified that the more restrictive title provisions, such as found in Exhibit 53–A, were placed in the contracts after TCC had been involved in some difficulty with a mill operator who had gone into bankruptcy and TCC had "lost some money that he (the logger) had been advanced." He further testified that the purpose of the more restrictive clauses was to insure the security of TCC in any future matters of this nature. Mr. Dunn stated that such a provision was common within the logging business where lumber was to be paid for on an "as cut"

basis, and that a right of approval by the seller was customarily reserved regarding the party to whom the logs were to be sold. This was done to secure deduction of the seller's stumpage by a responsible party.

From all of this foregoing evidence, the Court concludes that the parties intended that the contract only was to reserve a security interest in TCC and that the equitable title passed to the logger. This is sufficient to qualify TCC for a capital-gains treatment. See Giustina v. United States, supra.

On the basis of this evidence, the Court concludes that the tie-mill contracts granted a "contract right to cut" to the buyer and that TCC made a "disposal" of the timber involved in these contracts within the meaning of § 631(b) of the 1954 Code.

In reaching this conclusion, the Court relies upon the case of Stanley Shaffer, supra, which is directly in point with the case at bar. The Government citation of Carlen v. Commissioner, 220 F.2d 338 (9 Cir. 1955), is not in point here for the same reasons as discussed in United States v. Johnson, 257 F.2d 530 (9 Cir. 1958).

Shaffer involved precisely the situation found here in the tie-mill contracts. The seller and broker were commonly-owned corporations who were engaged in the same businesses as TCC and Cheney Oregon were in this case. The action was on behalf of the logger and miller to whom the lumber was sold, his claim being under § 631(a) of the 1954 Code. The security provisions in Shaffer did not provide for passage of title until payment, while the contracts in this case designated shipment as the date when legal title vested. The evidence showed that the seller exercised considerably more control over Shaffer's activities than did TCC here and that the seller could, upon default by Shaffer, designate a new "second party" to fulfill the contract. This latter clause does not appear in the contracts at bar and seems to indicate even more strongly that Shaffer was only performing a service which, upon his de-

fault, could be performed by another logger. Notwithstanding the stronger facts in that case for the Government, the Tax Court held that Shaffer was entitled to the treatment under § 631(a) of the 1954 Code. While many other similarities between the cases are pointed out in the briefs, the Court is satisfied that on the facts stated above, the tie-mill contracts fall within the holding of the Shaffer case.

## RESERVATION OF DETERMINATION OF ISSUE OF SIX MONTHS' HOLDING PERIOD

The evidence as now presented does not specifically point out any given timber tract that the Government claims TCC had not held for the requisite "more than six months before such disposal," and yet TCC has candidly stated that due to the involved cutting procedures there might be some question as to one or more of the timber tracts involved. Therefore, this issue is reserved unto the Court for the taking of additional evidence should it become necessary. It appears that both of the parties agree that the formula for computing the requisite time under the Code of 1954 is the period of time between the actual acquisition of the timber by TCC and the date when cutting actually commences under the terms of the agreement, while under the Code of 1939 the termination date is as of the date of the execution of the agreement of sale. This issue is referred to the parties for the purpose of negotiating a settlement of this issue. Upon the failure thereof, within 60 days from the date hereof, this reserved issue will be resumed for adjudication by the Court upon application of either party.

This Court concludes from the foregoing that TCC is entitled to a refund of the taxes paid, together with interest thereon, on the basis that the transactions reviewed were a "disposal" within the meaning of the pertinent sections of the Code of 1939 and the Code of 1954 and entitled to be treated as capital gain rather than ordinary income to TCC, excepting the gain from such tract or tracts

as may be determined as not held by TCC for the requisite "more than six months before such disposal."

Counsel for TCC is requested to submit proposed findings of fact, conclusions of law and decree upon determination of the reserved issue by agreement of the parties or adjudication by the Court.