# IN THE OREGON TAX COURT

STUCHELL et al,

*v.*

## DEPARTMENT OF REVENUE
(TC 1370)

Roy D. Lambert, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, and Kent Whiteley, Graham & Dunn, Seattle, represented plaintiffs.

Walter J. Apley, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered April 13, 1981.

**BERNARD SHEVACH, Judge Pro Tempore.**

The five plaintiffs have appealed from the defendant's Orders No. I 79-60, I 79-61, I 79-62, I 79-63 and I 79-64,* dated September 27, 1979, respectively.

The sole question presented is whether the money received by the plaintiffs, pursuant to certain timber cutting agreements, constituted income in respect of a decedent under IRC (1954) § 691. If it does, plaintiffs are not lawfully entitled to use the fair market value of the timber interest reported for federal estate tax purposes (IRC (1954) § 1014(c)) as a basis for computing gain realized for Oregon income tax purposes.

The facts of the case at bar are essentially expressed in a Stipulation of Facts entered into between plaintiffs and defendant, and in a Timber Cutting Agreement dated April 28, 1955, together with supplements and amendments thereto. These facts and the legal issue emerging from them may be summarized as follows:

On April 28, 1955, the plaintiffs, together with other parties, all denominated as owners, entered into an agreement designated as a Timber Cutting Agreement (herein called "1955 Agreement"), with the Kinzua Corporation, a Washington corporation, therein and herein designated as "buyer," which was engaged in a logging, lumber manufacturing and

---

* The "I" stands for an income tax order. At the bottom of each page of the Department of Revenue's five orders the page description "VL" (Valuation) was erroneously used.

wood-processing business in Kinzua, Oregon. Pursuant to the 1955 Agreement, owners, who owned certain timber and timberlands, together with adjunctive roads, easements, and other rights located in a number of Oregon counties east of the Cascade Mountain Range, granted to the buyer the right to cut and remove all of their merchantable timber, standing and down, situated on such timberlands. The buyer explicitly agreed to cut and pay for all of the timber. Specifically, and in the words of the 1955 Agreement, "buyer shall be definitely obligated to purchase under and pursuant to the terms and conditions hereof at least forty million feet of merchantable timber" as a minimum amount during each logging season. As a portion of the total minimum amount, buyer was bound to log each season a certain amount of pine timber, and, even though the minimum pine cut in a given season was not attained, was nevertheless obligated to pay for the minimum amount of pine, following the close of the logging season. Any such payment for uncut pine timber would apply in future seasons as a credit toward payment for pine timber logged in excess of the minimum seasonal requirement. The cutting obligation of the buyer was subject to excuse only in the event of fire or other casualty which would make logging practically impossible or render the mill facility owned by buyer incapable of utilizing the timber to be logged. A logging engineer determined the current fair market price of the timber to be cut for each season in accordance with the buyer's logging plan and the 1955 Agreement obligated the buyer to pay that price. The buyer was bound to pay for all logs logged during the preceding month on or before the 15th day of the following month.

For each logging season, the buyer was contractually committed to continue logging operations until the entire amount of timber designated by the logging plan and the 1955 Agreement was cut, and the buyer was responsible to owners for any loss suffered by owners if such quantum of logging was not consummated, barring acts of God and other unavoidable causes.

In a subsequent Supplemental Timber Cutting Agreement, dated April 15, 1972 (herein called the "1972

Supplement"), the owners and buyer affirmed the nature of the liability of buyer to owners under the 1955 Agreement by stating, with reference to a certain timber stand, that unless all the merchantable timber was cut by April 21, 1972, "[o]wners will have a right of action against Buyer under the Timber Cutting Agreement [herein called the 1955 Agreement] for any loss suffered by them because of Buyer's failure to timely cut the merchantable timber." The time for the cut was extended by the parties to a period on or before April 21, 1977, and as part of the consideration for the extension, the 1972 Supplement recited a release by buyer of a certain reversionary timber right it held "in exchange for release by Owners of its right of action against Buyer under the Timber Cutting Agreement [herein called 1955 Agreement], as described above * * *." The 1972 Supplement continued by reciting that:

"2.   In the event Buyer shall fail to cut and remove the timber as just described and compensate Owners therefor by April 21, 1977, Owners shall be entitled to exercise any and all rights of action available to them against Buyer by operation of law and, in addition and without limitation, such rights of action as may be available to them under the terms of the Timber Cutting Agreement [herein called 1955 Agreement]."

It was further stipulated in the 1955 Agreement that in the event the buyer did not file a logging plan for a given season, then for the purpose of determining any damage which owners might claim of buyer, the timber the buyer would have been required to cut during the particular logging season was to be considered as timber of the same value as was cut during the preceding year.

By a document entitled "Supplement and Amendment to Timber Cutting Agreement of April 28, 1955," dated December 30, 1963 (herein designated as "the 1963 Supplement"), the intended relationship between the owners and the buyer was definitely limned. Under paragraph 8 of the 1955 Agreement, buyer had the option to terminate it by providing to owners written notice of its election to do so on or before January 1 of any year. The 1963 Supplement specifically stated that "Buyer shall no longer have the option right to

elect to cancel and terminate its remaining rights for following logging seasons to cut and purchase timber under the Timber Cutting Agreement but that Buyer is obligated pursuant to paragraph 8 thereof to cut or pay for all timber covered thereby in accordance with the terms and provisions thereof as herein modified." The rationale for the 1963 Supplement was stated in the Supplement to be the desire of the buyer to assure itself a perpetual cut program for the supply of its mills. As an aid to the attainment of the perpetual supply and cut of timber, the 1963 Supplement allowed a reduction in buyer's annual minimum logging of pine timber and provided that buyer would carry out, at its sole cost and expense, such sanitation and timber stand improvement as it desired and as the owner reasonably requested. The agreement pointedly stated that the timber improvement will be "largely for the benefit of buyer."

On or before March 15 of each year, the buyer was to file with owners a logging plan specifying both the logging area and the amount of timber it would remove from the area in the coming season. Owner had the right to disapprove of any logging plan "in the event," as the 1955 Agreement stated, "that in owners' opinion, reasonably exercised, such logging plan would materially affect the value of the remaining timber, it being understood and agreed by both buyer and owner that buyer shall be required to so carry on its logging under this Timber Cutting Agreement as to best conserve the utilization and value of the remaining timber and buyer shall not be free to indiscriminately designate timberlands for cutting during any logging season."

The 1955 Agreement obligated the buyer at all times to maintain all logging roads, other than those having a use for one logging season only, in as good condition as existed at the date of the 1955 Agreement, and buyer had the right to develop such roads in the future as it deemed advisable. For the right granted to it by owners to use roads, rights-of-way or easements controlled by the owners, buyer agreed to pay to owners $1.25 per thousand board feet of timber logged, and

further obligated itself to comply with and perform all conditions, requirements, and terms to which any of the roads, easements and rights-of-way might be subject.

The timberlands were subject to certain Indentures of Mortgage which were not introduced as evidence but to which reference was made in the 1955 Agreement. Significantly, under the 1955 Agreement terms, the buyer expressly and specifically agreed, with respect to all property covered by the 1955 Agreement, to comply fully with and conform to all of the terms, covenants and obligations to be performed by the Trustors (the owners-mortgagors) under the terms of the mortgages, and that the buyer

> "* * * will in each and every respect comply with all of the said terms, provisions and conditions applicable to logging and harvesting the timber, as provided in said two Indentures [mortgages], including without limiting the generality of the foregoing, the maintenance of all fire protection plans and requirements, the issuance and making of all reports with respect to logging, the economic utilization of said timber with the avoidance of high-grading or creaming and otherwise will comply with all of the said terms and conditions of said two Indentures and after said two Indentures become satisfied and of no further force and effect, will continue to comply with all of said terms, conditions and provisions as if said terms, conditions and provisions were a part of this Agreement * * *."

In 1953 and 1954, buyer and owners entered into short-term timber-cutting contracts covering periods of less than a year under which buyer cut and paid for certain amounts of timber. Although other timber was available, by 1955 it was evident that buyer's success was largely dependent upon its ability to enter into cutting arrangements with the owners. Accordingly, in April 1955, buyer entered into the long-term timber-cutting agreement above discussed.

Owners and buyer have stipulated that the volume of merchantable timber to be cut under the agreement was indefinite in part because the total volume of timber to be cut over the years was and is unknown and would not and will not

be known until many years in the future. The growth factor of the timber necessarily depended upon weather conditions and inevitable hazards such as fires, disease and insects. Additionally, the volume of timber to be cut and the volume and utilization thereof was, is, and will remain for some years to come, indefinite by reason of the fact that, due to changing market conditions, new technological improvements and utilization purposes, what is merchantable may vary over the years.

On August 19, 1964, and on August 20, 1973, two of the owners, namely Neva Denney Stuchell and David E. Wyman, respectively, died. The plaintiffs acquired their interest in the timberlands, the timber growing and to be grown thereon, and their rights under the 1955 Agreement, as supplemented and amended, from these decedents or retained such interests as a surviving spouse's share of community property. Notices of assessment issued by the defendant resulted in an increase to the plaintiffs of IRC (1954) § 631(b) gains in the following amounts, all of which are in dispute:

| Taxpayer | Tax Period | Proposed Adjusted Amount |
|---|---|---|
| Edwin W. and Blanche Stuchell | 1974 | $ 5,581 |
| Edwin W. Stuchell, Trustee | 1974 | 5,580 |
| Estate of David E. Wyman | 1973 | 14,392 |
| Estate of David E. Wyman | 1974 | 57,359 |
| Estate of David E. Wyman | 1975 | 1,768 |
| David E. and Helen R. Wyman | 1973 | 12,414 |
| Helen R. Wyman | 1974 | 58,292 |
| Helen R. Wyman | 1975 | 6,485 |

All of the above amounts in dispute are portions of plaintiffs' undivided interests in the proceeds of timber cut, removed and paid for under the 1955 Agreement, as amended and supplemented, during the respective reporting years or portions thereof subsequent to the dates of death of the

plaintiffs' respective predecessors in interest or of the plaintiffs' spouses who owned such interests as community property with plaintiffs. The plaintiffs reported the gain realized, using the depletion rates which reflected the basis of the timber stepped-up to the date-of-death values of the timber, pursuant to IRC (1954) § 1014. The proposed adjustments are attributable solely to the defendant's denial of the stepped-up basis pursuant to IRC (1954) § 1014 for the alleged reason that the amounts constitute income in respect of a decedent under IRC (1954) § 691. The amount of the basis adjustment is not disputed. The notices of assessment were sustained by the defendant in its Orders No. I 79-60, I 79-61, I 79-62, I 79-63 and I 79-64, from which plaintiffs appeal.

As stated above, the sole issue for decision in this case is whether or not the income from the 1955 Agreement, as amended and supplemented, for the years or portions thereof in 1973, 1974 and 1975, all of which dates were after the date of decedents' deaths, constituted income in respect of a decedent. If it is, the defendant's proposed adjustments are valid; if not, the adjustments must be expunged. The issue will now be considered.

The Oregon Personal Income Tax Act of 1969 incorporates by reference many provisions of the federal Internal Revenue Code of 1954 for the purpose of defining "taxable income," except to the extent that the act otherwise provides. ORS 316.007, ORS 316.012 and ORS 316.048. IRC (1954) § 1014(a) provides, in relevant part, as to the issue posed in the case at bar:

> "Except as otherwise provided in this section, the basis of property in the hands of a person acquiring the property from a decedent * * * shall * * * be the fair market value of the property * * * at the applicable valuation date * * *."

IRC (1954) § 1014(b)(6) provides the same basis adjustment for a surviving spouse's community property interest in the property owned by the decedent at the date of death. The defendant contends that the plaintiffs' timber interests do not qualify for the foregoing basis adjustment

because of the exception of IRC (1954) § 1014(c) which provides:

■     "This section shall not apply to property which constitutes a right to receive an item of income in respect of a decedent under section 691."

The exception of IRC (1954) § 1014(c) directly raises the inquiry as to whether plaintiffs' interest in the timber constitutes a right to receive income in respect ·of a decedent under IRC (1954) § 691.

IRC (1954) § 691, in relevant part, states:

"(a)     Inclusion in gross income.

"(1)     General rule. The amount of all items of gross income in respect of a decedent which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period * * * shall be included in the gross income, for the taxable year when received, of:

"(A)     the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent;

"(B)     the person who, by reason of the death of the decedent, acquires the right to receive the amount, if the right to receive the amount is not acquired by the decedent's estate from the decedent; * * *.

"* * * * *

"(3)     Character of income determined by reference to decedent. The right, described in paragraph (1), to receive an amount shall be treated, in the hands of the estate of the decedent or any person who acquired such right by reason of the death of the decedent, * * * as if it had been acquired by the estate or such person in the transaction in which the right to receive the income was originally derived and the amount includible in gross income under paragraph (1) * * * shall be considered in the hands of the estate or such person to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount."

By way of further definition of the term "income in respect of a decedent," Treas Reg § 1.691(a)-1(b) (1965), in part, states:

> "In general, the term 'income in respect of a decedent' refers to those amounts to which a decedent was entitled as gross income but which were not properly includible in computing his taxable income for the taxable year ending with the date of his death or for a previous taxable year under the method of accounting employed by the decedent. * * *"

Treas Reg § 1.69(a)-3(a) (1966) characterizes the income thusly:

> "(a)  The right to receive an amount of income in respect of a decedent shall be treated in the hands of the estate, or by the person entitled to receive such amount * * * by reason of his death, as if it had been acquired in the transaction by which the decedent * * * acquired such right, and shall be considered as having the same character it would have had if the decedent * * * had lived and received such amount. * * *"

■     From the above statutes and regulations, the intention is manifested that the estate of a decedent or other person must include, for the taxable year when received, all gross income in respect of the decedent, if the right to receive the amount is acquired by them from the decedent, and if the gross income was not properly includible in the taxable period in which the decedent died or in a prior period; and any such gross income must be considered as having the character it would have had if the decedent had lived and received such amount. Patently, the statute seeks to substitute the recipient for the decedent as the reporter of gross income and to endow the recipient with essentially the same tax status the decedent would have had if he were living and receiving the income.

To elucidate further the purpose of the statute and to penetrate the opaque and enigmatic phrase of "income in respect of a decedent," resort must be made to the legislative history of IRC (1954) § 691.

Prior to 1934, the courts had held that income

accrued before death but received by the decedent's estate was not income to the estate but a part of its corpus. Accordingly, although an estate tax would have been paid on the income to the extent that the income enhanced the estate corpus, neither the estate nor the dececent, if he were a cash-basis taxpayer, would have paid any income tax on the amounts involved. To rectify this omission, the Congress of the United States enacted section 42 of the Revenue Act of 1934, ch 277, 48 Stat 680, which required that all income accrued up to the date of death, not otherwise properly includible for such period or a prior period, be included in the income tax return of a decedent for the period in which fell the date of his death. In *Helvering v. Enright,* 312 US 636, 644, 645, 61 S Ct 777, 85 L Ed 1093, 1098, 1099 (1941), the United States Supreme Court noted that the intendment of IRC (1934) § 42 was to place the cash-basis taxpayer on the accrual basis. The Supreme Court enunciated its approval of the following definition of accrual:

> " 'Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income.' * * *"

The statutory purpose of placing the deceased cash-basis taxpayer on the accrual basis for the tax return period in which he died was construed thusly by the court:

> "* * * Accruals here are to be construed in furtherance of the intent of Congress to cover into income the assets of decedents, earned during their life and unreported as income, which on a cash return, would appear in the estate returns. *Congress sought a fair reflection of income."* (Emphasis supplied.)

Thus, by virtue of IRC (1934) § 42, income of a deceased cash-basis taxpayer, which was not received during his lifetime, was nevertheless subjected to income tax on his final return if, at the date of death, he was possessed of the right to receive the income.

It was, however, soon perceived that IRC (1934) § 42,

as so interpreted, occasioned from time to time, an inequitable result. Under IRC (1934) § 42, there was "lumped" or "bunched" amounts of income into the year of death which ordinarily would have been receivable over a period of several years, with resultant heavy surtaxes. This caused an unexpected hardship during the last taxable period of a decedent who was a cash-basis taxpayer. To alleviate the hardship, IRC (1954) § 691 was enacted (originally as IRC (1934) § 126). This section changed the existing law by providing that such amounts of income should not be included in the decedent's income, but should be treated, in the hands of the entity or person receiving them, as income of the same nature and to the same extent as such amounts would be income if the decedent remained alive and received such amounts. To this effect, *see Davison's Estate v. United States,* 292 F2d 937, 8 AFTR2d 5178, 155 Ct Cl 290 (1961), *Trust Co. of GA. v. Ross,* 262 F Supp 907 (1966), *aff'd* 392 F2d 694, 21 AFTR2d 311 (1967); *O'Daniel's Estate v. Commissioner of Internal Revenue,* 173 F2d 966, 967-968, 37 AFTR 1249, 1250 (1949). Essentially, IRC (1954) § 691 sought, from a tax standpoint, to treat the decedent's death as if it had never occurred.

With this history as a guide, the ultimate question in the present case is whether the decedents who were cash-basis taxpayers, had a right to receive, in terms of IRC (1954) § 691, the income for the years in controversy, which right, in turn, had been acquired by the plaintiffs. Precedents will now be considered.

In *O'Daniel's Estate, supra,* the decedent was an officer, director and employee of a company for a period of 20 years prior to his death in 1943. The company had a bonus plan in which the decedent had participated for a number of years, but no employee had any enforceable right under the plan to a bonus allotment for a current year until the share was designated by the appropriate company officer. No bonus share for 1943 was designated for the decedent until 1944, when it was determined and paid to his estate. The Commissioner of Internal Revenue, in assessing the income of the decedent's estate in 1944, added the bonus amount which had not been reported by the estate in its return and thereby

determined a deficiency in income tax for that year. In upholding the validity of the deficiency assessment, the court stated:

"The amount * * * was plainly gross income in respect of the decedent which had to be included in the taxable year when received for the reason that the right to receive it was 'acquired by the decedent's estate from the decedent' within the meaning of Section 126(a)(1)(A) [now Section 691], supra. It is true that the decedent would not have had a legally enforceable right to receive the foregoing amount until it was allocated by the * * * Company, but the payment clearly represented compensation for his services and any right to receive it that was realized by his estate was acquired through him and never arose in any other way or through any other source. * * *" [ *O'Daniel's Estate v. Commissioner of Internal Revenue,* 173 F2d 966, 967, 37 AFTR 1249, 1250.]

To the same effect, *see Bausch's Estate v. Commissioner of Internal Revenue,* 186 F2d 313, 40 AFTR 61 (1951), in which the court held, citing *O'Daniel's Estate, supra,* that compensation for a period of twelve months to the executors of the estate of certain corporate founders and employees was taxable as income in respect of a decedent even though no agreement existed between the company and the decedents to make such payments.

In *Commissioner of Internal Revenue v. Linde,* 213 F2d 1, 45 AFTR 1522 (1954), the decedent (who died in 1943) owned and operated vineyards in California. He marketed his wine grapes by delivering them to cooperative marketing associations of which he and other grape growers were members. The marketing associations processed their members' grapes into wine and marketed the wine on behalf of the members. The members of the associations delivered agreed quantities of grapes to the wineries of the associations where they were commingled with those of other members and each year became a part of what was termed a wine pool for that year. Each member was assigned a percentage of interest in the pool, and ultimately the net proceeds from the sales of the products were returned to the members of the pool in proportion to their percentage of interest therein. In 1944, the

decedent's share of liquidation proceeds of the pool was paid to the decedent's estate and in 1945 decedent's share of additional proceeds was paid to his widow as the legatee under his will. The issue presented was whether the 1945 payment to the widow constituted gross income in respect of a decedent and thus was taxable income to her. The Tax Court of the United States, having determined that the associations did not sell the wine products until 1944, which was after the decedent's death, ruled that no distributable proceeds were due him when he died and thus no right to income arose during his lifetime. On appeal, the Commissioner of Internal Revenue argued that the decedent obtained a right to income during his life by virtue of having sold grapes to the associations. In holding the 1944 income to be income in respect of a decedent, the court held:

> "While the Commissioner does undertake to argue that under the marketing agreements here involved there was a sale of grapes to the associations, we find it unnecessary at this stage to reach that question; for it is our judgment that even assuming that sales were not made by decedent during his lifetime, yet the amounts paid to the respondent taxpayer in 1945 pursuant to and in accordance with the agreements with the associations constitute 'income in respect of a decedent' within the meaning of section 126. * * *"

Referring approvingly to the *O'Daniel's Estate, supra,* the court continued:

> ■      "* * *It was held [in O'Daniel's Estate] that such sum [the bonus amount] was gross income in respect of the decedent * * * notwithstanding decedent during his lifetime had no enforceable right to receive that amount. * * * The court [in O'Daniel's Estate] said: 'The bonus was derived through rights he [O'Daniel] had acquired, which even if not fixed at the time of his death were then expectancies which later bore fruit.' In our view the statement just quoted is equally applicable to the proceeds of the wine pools received by the respondent taxpayer in the year 1945. * * *" [ *Commissioner of Internal Revenue v. Linde,* 213 F2d 1, 3, 45 AFTR 1522, 1524 (1954).]

The underlying rationale of the *Linde* opinion, *supra*

(which expressed the basis in the court's view of the decedent's right to the income), is found in the following excerpt:

> "* * * The payments which the taxpayer received in 1945 were realized under and in consequence of contracts and deals made by the decedent in his lifetime. No act or thing taken or performed by the taxpayer operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent's contract and arrangement with the copperative associations. * * *" [ *Commissioner of Internal Revenue v. Linde,* 213 F2d 1, 4, 45 AFTR 1522, 1525 (1954).]

In *Trust Co. of GA. v. Ross,* 392 F2d 694, 21 AFTR2d 311 (1967), the decedent had placed in escrow, pursuant to a contract of sale, shares of stock. Prior to the closing of the transaction and the payment of the purchase price, the decedent died. Some aspects of the transaction, which the contract contemplated, had to be performed by the executor in connection with the closing. In the court below, *Trust Co. of GA. v. Ross,* 262 F Supp 900, 19 AFTR2d 489 (1966), it was held that the proceeds of the sale were gross income in respect of a decedent for the reasons stated by the court:

> "* * * It was his [the decedent's] economic activity leading up to and including the signing of the * * * agreement which produced the income now in dispute. There were no acts of any consequence taken or performed by the estate * * * which operated to procure or give rise to the payments involved. Such payments were the direct result of the efforts of Carling Dinkler, Sr., [the decedent] and nothing of substance remained to be performed after his death except the formal closing." [ *Trust Co. of GA. v. Ross,* 262 F Supp 900, 909, 19 AFTR2d 489, 497 (1966).]

The appellate court affirmed the decision but distinguished its ground of affirmance from that of the trial court as follows:

> "Although it is pertinent to inquire whether the income received after death was attributable to activities and economic efforts of the decedent in his lifetime, these activities and efforts must give rise to a right to that income. And the right is to be distinguished from the activity which creates the

right. Absent such a right, no matter how great the activities or efforts, there would be no taxable income under § 691. * * *

"* * * * *

"Mr. Dinkler entered into a binding contract prior to his death. That contract required the conveyance of the property from whence the income in litigation was derived. The contract created a right to these proceeds in Mr. Dinkler at the time the contract was executed. * * *" [ *Trust Co. of GA. v. Ross,* 392 F2d 694, 695-696, 21 AFTR2d 311, 312-313 (1966).]

The above case was approvingly cited in *Keck v. Comm.,* 415 F2d 531, 24 AFTR2d 69-5554 (1969). In the *Keck* case the decedent owned stock in three affiliated corporations which had agreed, prior to his death, to sell their assets. The consummation of this sale and distribution of corporate funds to shareholders by way of liquidation was subject to a number of contingencies, including the prior approval of the Interstate Commerce Commission and a contractual commitment by the stockholders to a plan to liquidate the corporation. The contingent events were satisfied after decedent's demise. In holding that the liquidation distributions were not income in respect of a decedent to his estate and widow, the court concluded that, because of the contingencies existing at the date of his death, the decedent, prior to his death, did not possess either the right or the power to require the corporations to liquidate and, accordingly, did not possess the right to receive any proceeds from the contemplated liquidation. Summarizing its position, the court stated:

"We agree with the United States Court of Appeals for the Fifth Circuit [*Trust Company of Georgia v. Ross, supra*] in holding that the right to income, under the provision of the statute here pertinent, is to be distinguished from the economic activities that create that right and that, absent such a right, no matter how great the activities, there is no taxable income under Section 691." [ *Keck v. Comm.,* 415 F2d 531, 534, 535, 24 AFTR 69-5554, 69-5557 (1969).]

Among the judicial concepts attributed to "income in respect to a decedent" by the above decisions, are these:

(a) *O'Daniel's Estate, Bausch's Estate* and the *Linde* cases, *supra,* stated that there need not be a right to receive income by a decedent at the date of death, but that income would nevertheless be in respect of the decedent if a subsequently created right to receive it by his estate or other person covered by IRC (1954) § 691 arose because of the decedent's lifetime services or because of contracts or deals made by the decedent in his lifetime. Thus, the accrual concept of accounting, as defined by the *Helvering* case, *supra,* namely, the "right to receive" income by a taxpayer, was abandoned. It was supplanted by the idea that an "expectancy" or hope of income, though not legally enforceable at the date of decedent's death, would, if later realized, qualify as income in repect of the decedent.

(b) In *O'Daniel's Estate, supra,* the court found that a sale of the wine products at the date of decedent's death was not necessary to create income in respect of the decedent, but that proceeds received from a sale after his death, provided the proceeds arose from contracts and deals made by him during his lifetime, fulfilled the statutory requirement.

(c) Implicit in the *O'Daniel's Estate, Bausch's Estate* and *Linde* decisions, *supra,* was the conclusion that the amount of proceeds received after death need not have been known at the date of decedent's death, since in none of these cases was the amount known or knowable until post-death determinations were made.

(d) In the *Trust Co. of GA.* and the *Keck* cases, *supra,* the court decisions diverged from the foregoing opinions and decided that IRC (1954) § 691 applied only if a legally enforceable right to proceeds on the decedent's part existed at the date of his death.

It is the opinion of this court in the case at bar, based both on precedent and the general purview of IRC (1954) § 691, that the income in controversy is income in respect of a decedent. If the position is adopted that a legally enforceable right to the income must have existed when the decedents died

in order that IRC (1954) § 691 apply, the facts of the case are fully consistent with that position. Under the terms of the 1955 Agreement and the 1963 Supplement, the buyer was obligated to cut and pay for all timber, which included all merchantable timber, standing and down, situated on the timberlands. The impact of this provision is clearly comprehended when it is seen in its contractual context as a provision that specifically replaced and nullified paragraph 8 of the 1955 Agreement, which gave the buyer the option right to elect to cancel and terminate its rights for following seasons to cut and purchase timber under the 1955 Agreement. Not only did the buyer have a plenary obligation to cut the timber, but minimal seasonal cuts were prescribed; and, if the minimum cut was not fulfilled, the buyer was subject to the sanction of damages for any loss thereby suffered by owners. Under the 1955 Agreement and its Supplements, buyer could be excused from cutting its seasonal quota only if disaster would render logging impossible or render the mill facility unusable. Further, buyer was subject to damages if he did not file a logging plan for a logging season, the measure of damages being equal to the value of logs cut in the previous year. This obligation of buyer to cut and purchase logs created a correlative right to the proceeds, or gross income therefrom, to the owners.

To render efficacious its contractual right and obligation to cut timber, buyer was obligated to maintain logging roads, to maintain fire protection plans and requirements, and to utilize the timber economically. Thus, the indicia of a consummated, enforceable legal right and duty incumbent upon both owners and buyer were present, resulting in an enforceable purchase of the timber by buyer and a right to the proceeds by owners, and thus by the plaintiffs.

If the position is adopted, as some of the above cases hold, that there need not be a right to income enforceable by plaintiffs at the date of their death, a position which the court does not believe accords with the facts of this case, the income received would nevertheless be in respect of a decedent. Under the doctrine of the *O'Daniel's Estate, Bausch's Estate* and *Linde* cases, *supra,* the income would be regarded as "in

respect of a decedent," because the proceeds arose from contracts made by the decedents, together with the other owners, during their lifetimes. Also, even if a sale of the timber had not occurred in terms of legal requisites, nevertheless, pursuant to *O'Daniel's Estate, supra,* such a sale was not mandatory for the existence of income in respect of a decedent. Additionally, the fact that the gross income was not known or knowable at the date of death does not preclude the relevance and applicability of IRC (1954) § 691, as *O'Daniel's Estate, Bausch's Estate* and *Linde, supra,* necessarily concluded under their facts.

Plaintiffs argue that the timber receipts do not constitute income in respect of a decedent unless the decedents, at their respective dates of death, possessed the right to receive income under the 1955 Agreement and supplements thereto for timber cut and removed after their deaths. Plaintiffs further argue that the right to receive income could not exist unless the timber was sold under the 1955 Agreement and its supplements, and that no sale was effected because the 1955 Agreement as supplemented was executory in nature, granting only a right to enter upon certain lands and cut and remove an unspecified quantity of timber over an indefinite time. Further, plaintiffs contend that the owners retained substantially all of their incidents of ownership, such as the risk of loss, benefit of appreciation, right to modify cutting areas and the right to require appropriate forestry practices. Finally, they assert that the timber is not sold until it is cut and removed.

The court agrees that the decedents must have possessed, at the date of their deaths, the right to receive the income derived from timber proceeds after their deaths. However, plaintiffs' stress on a "sale" is misplaced; income in respect of a decedent arises from the right to receive the income, not from technical compliance with the legal particularities of a sale. As this opinion has previously mentioned, the right of the decedents to receive the income was contractually assured; noncompliance by the buyer could result in actions for damages, as well as other sanctions. The 1955 Agreement and its supplements did far more than grant "only a right" to enter upon certain lands and cut and remove unspecified

quantities of timber: the agreement created a *duty* and *obligation* by the buyer to cut all of the merchantable timber in specified minimum annual amounts or to respond in damages for a failure to do so. The removal of the timber would be over an indefinite time since the owner desired a perpetual source of logs. However, decedents had the right to create, and in fact did create, not only the "perpetual" right to remove timber existing at the time of the 1955 Agreement and supplements thereto, but also created in the buyer a perpetual interest, in the sense of having the totality of the decedents' interests, in all of the merchantable timber that was then present or that would thereafter be grown on the timberlands with a concommitant right of removal. Such a perpetual interest is recognized in Oregon. *See Franke v. Welch,* 254 Or 149, 152, 458 P2d 441 (1969). Assuming, without deciding, that a sale did not occur, the court concludes that a right to receive income by the decedents patently was in being at the date of their deaths.

The right by decedents to modify cutting areas and insist on appropriate forestry practices did not imbue them with attributes of ownership in derogation of the timber rights of the buyer. In *Paullus v. Yarbrough et ux,* 219 Or 611, 616, 347 P2d 620, 623 (1959), a timber sales contract stipulated that:

> " 'It is understood and agreed that the logging operation is to be a selective logging operation in that the Sellers shall designate to the Buyer which poles and logs shall be removed and the order of their removal. * * *' "

In determining that the power by sellers to designate the timber to be logged did not prevent passage of title to the buyer, the court held:

> "The provision calling for a selective logging operation permitting the sellers to designate the poles and logs which may be removed is not inconsistent with the existence of a binding contract for the sale of the timber. The provision is not to be construed as vesting in the sellers the uncontrolled discretion to designate the timber which they desire to sell. Such a construction is not consistent with other terms of the

agreement, particularly the clause in which the sellers agree to sell all of the merchantable timber on their lands.

"* * * * *

"* * * We hold that this provision merely reserved to the defendants [Sellers] the power to make a reasonable proscription in designating the timber to be cut. They could not prohibit the plaintiff [Buyer] from cutting merchantable timber, the removal of which would not unreasonably damage the younger trees. * * *

"* * * * *

"* * * the designation of the trees capable of removal without serious damage could be made in accordance with objective standards. That being true the title could be regarded as passing upon the execution of the contract. * * * But even if it could be said that the future identification of the trees prevented the complete title from passing, we think that the contract should be regarded as creating in the plaintiff [Buyer] some form of property interest in the timber. Were we to apply without question the traditional common law property concepts we would describe the plaintiff's irrevocable privilege to remove the timber as a profit prendre. * * *" [*Paullus v. Yarbrough et ux*, 219 Or 611, 619, 621, 639, 347 P2d 620, 624-625, 634 (1959).]

Plaintiffs' assertion that the decedent's risk of loss in the timber is a bar to the applicability of IRC (1954) § 691 is without merit. If a loss occurred, the decedents pro tanto would not have a right to receive the income; however, the enforceability of their right to proceeds would continue as to all remaining merchantable timber. Finally, if the decedents have the benefit of appreciation in the timber, it is only because they have the right to receive the proceeds from it. Necessarily, growing timber will appreciate and this appreciation fully benefits the buyer because of the timber resources made available to it.

The position of the defendant implements the overriding and fundamental concern of IRC (1954 § 691; namely, that income be fairly reflected and that it be reported for

income tax purposes without distortion, even in the event of death.

For the foregoing reasons, defendant's Orders No. I 79-60, I 79-61, I 79-62, I 79-63 and I 79-64 are affirmed. Defendant is awarded its statutory costs and disbursements.